**People of the State of Illinois, Plaintiff-Appellee, v. Freddie Jackson, Junior, Defendant-Appellant.**

**Gen. No. 51,248.**

First District, Fourth Division.

December 11, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James N. Gramenos and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

**Offense charged**

Rape. (Ill Rev Stats (1963), c 38, § 11–1.)

**Defense at trial**

Consent.

**Judgment**

After a jury trial, defendant was found guilty and sentenced to a term of 20 to 40 years.

**Points raised on appeal**

(1) The evidence did not prove defendant guilty beyond a reasonable doubt.

(2) Defendant was denied a fair trial by the introduction of evidence of other crimes and of defendant's silence in the face of purported accusations.

(3) The mitigation hearing was inadequate.

(4) The sentence was excessive.

**Evidence**

*Prosecutrix,* for the State

She was nineteen years old and a second-year student at the University of Chicago, living on campus and employed part time in the University art library located on the fourth floor of Goodspeed Hall. She brought some lunch with her to work, and never left the building to go out for lunch.

On Sunday, May 16, 1965, she went to the library at 1:00 p. m. and opened it for the use of any students who might care to study there. Being Sunday, there was no one in the building except three or four girls studying in the library.

After working for about twenty minutes, she left the library for the nearest women's rest room, which was on the second floor. While descending the stairs, she noticed a negro man, whom she had never seen before (later

identified in court as defendant), ascending the stairs from the first floor. Thinking his presence there strange on a Sunday afternoon, she decided that if he were going to the library, she should be there to attend it. She asked him what he was doing there. He replied by asking if the library were open. She said yes, and ascended the stairs with him, inquiring if she might be of assistance. As she passed ahead of defendant, he grabbed her from behind, put his hand tightly over her mouth and nose, and produced a knife which he held in front of her eyes. The blade of the knife was thin and pointed and about a foot long. Defendant was approximately six feet tall and weighed about 190 pounds. She was five feet, five inches tall and weighed 117 pounds.

With his hand over her mouth, defendant then forced her down the stairs to the second floor and into the women's rest room, the whole time holding the knife in front of her so she could see it, and warning her not to scream. He told her that if she did what he told her to do, he wouldn't hurt her. Then he forced her into a toilet stall and locked the door behind him. He started to unbutton her blouse, so, to avoid injury, she removed her blouse and skirt. He then placed the knife in his belt and forced her to submit to two different oral-genital acts. Again he drew the knife to force her cooperation, and told her to keep her eyes closed so she wouldn't remember him. At that point, a woman entered the washroom, and the defendant put his feet up on the toilet seat so that his presence would not be observed. When the woman left, defendant again displayed the knife, and had intercourse with the prosecutrix. After the act, she dressed, and he told her not to report the incident to the police because he knew where she worked and he would return to harm her. He then asked for her telephone number. Being afraid not to do what he said, she gave him the dormitory number where she lived, knowing that the one number was for about 300 girls. Defendant told her to remain in

the rest room for five minutes, and he then left. During the whole incident she couldn't help shaking from fright, but she never cried out for help as she knew it would do no good with only three girls two flights upstairs and he with a knife. Also, she was afraid of getting hurt and she wanted to get it over with as soon as possible. He warned her that if she told the police he would be back, because he knew where she worked.

At defendant's direction, she stayed in the rest room for five minutes after he left and then returned to the library, where she confided in a friend, Judy Lichtenstein, her experience with defendant. Prosecutrix was afraid to call the police, so Miss Lichtenstein then phoned the police. Later that day, prosecutrix described defendant and the incident to the police, and went to the hospital where she was given a smear test.

Five days later, it was discovered that she had gonorrhea and she was hospitalized for two weeks because of it. She next saw defendant on June 3, 1965, while in the hospital. She identified him from his appearance and his voice.

*Judy Lichtenstein,* for the State

She was a student at the University of Chicago who had known the prosecutrix for two or three years, as they both worked in the library. On May 16, 1965, she was at the art library with the prosecutrix at 1:00 p. m., when it opened. At about 1:15 to 1:30 she saw the prosecutrix leave, and at about 2:00 o'clock she saw her return, pale, nervous, and shaking. The prosecutrix then pulled her aside and asked her if she had seen a man of the defendant's description with a knife. She was then told what had happened in the women's washroom. She immediately called the police, who arrived within a few minutes.

*Police Officer Fred Hills,* for the State

On June 3, 1965, at approximately 9:00 p. m., he investigated a report that a man was seen in the washroom of the Harper Library of the University of Chicago.

215

There had been three or four rapes in the vicinity, and there were three or four fellows the police were looking for. Defendant fitted the description of one of the assailants, so they arrested him when they saw him in the hallway of the library, and defendant had no reasonable explanation as to what he was doing there. He searched defendant and found a pocket knife. That evening he took defendant to the hospital where the prosecutrix positively identified defendant, who said nothing at that time.

*Police Officer Edward Spellar,* for the State

He joined Officer Hills when defendant was first arrested at the Harper Library, which is about 250 feet from the art library. He later returned to homicide headquarters where he interrogated defendant. Defendant denied raping or having sexual intercourse with prosecutrix. He refused to answer as to whether he knew the prosecutrix.

*Police Detective Joseph Marin,* for the State

On June 4, 1965, he accompanied defendant to defendant's apartment. Upon searching the apartment, he found a bottle of pills with a prescription dated 5–12–65. Defendant stated that it was medicine he was taking for treatment of venereal disease.

*Richard Moy,* for the State

He is a licensed doctor. He first saw prosecutrix the day following the alleged attack. He examined the notes of the examining physician who had seen her in the emergency room. He saw her several more times until she was hospitalized after diagnosis of gonorrhea. The examination on May 17, 1965, was too early to disclose the disease, but he expressed the opinion that the development of the disease was compatible with her having received the infection at the time of the alleged attack.

*Lillian Kane,* for the defense

She is supervisor of the medical records department at the University of Chicago Hospitals and Clinics. The

216

records show that the prosecutrix was examined at 2:50 p. m. on May 16, 1965; that she was found to be infected with gonorrhea on May 26; and that she was hospitalized from May 30 through June 4. The prosecutrix was seen again at the Clinic on the 7th, 11th and 16th of June.

Defendant was first seen on May 12, 1965, and an examination revealed an impression of gonococcal urethritis. No treatment was shown on May 12. His next examination was on May 19. A finding was made of myalgia, and he was referred to the employees' health service. There was no further record of defendant.

*Freddie Jackson, Jr.,* defendant, on his own behalf

He was born in Jacksonville, Florida, and came to Chicago in 1965 at age of twenty-two. On May 7, 1965, he began to work as an animal technician for the University of Chicago. He first met the prosecutrix in the park during his lunch hour two days later (a week before the alleged offense), and they had a short conversation. A few days later, they met again at a shop where he bought lunch. She was in a hurry, so she gave him her telephone number. He called, but could not remember her last name; so the dormitory switchboard could not connect him.

He had seen a girl, who is now his fiancee, on the evening of May 15 at her home, as he had done four or more times during the week he had been working for the university.

On May 16, by prearrangement, he met the prosecutrix on the stairway of Goodspeed Hall at approximately 11:30 in the morning. They met on the second floor and began talking. She pulled him to the stairway landing, holding his hand. This led to kissing and necking, and she was pleased. Finally, they went to the women's rest room on the second floor, where she consented to and cooperated in an act of intercourse with defendant. He denied that he had shown her the knife which he had, and denied the use of any threats or force. While they were having in-

tercourse, someone entered the washroom and the prose-
cutrix signaled him to be quiet. After the act, he told
her that he had gonorrhea and that he wanted her to get
a checkup. She became quite upset over the fact that he
might have infected her. She called him a "nigger" and
said, "You niggers are all alike."

*Charles Pace,* for the defense

He is also an animal technician at the University of
Chicago. He met defendant when defendant began work-
ing for the university early in 1965. It may have been in
May 1965. He considers defendant a good friend, and in-
troduced him to the girl "he now calls his fiancee." He
had seen defendant with the prosecutrix prior to May 16,
1965, as they were coming back from lunch one day. He
assumed it was the prosecutrix, as defendant had told
him he had been seeing a girl, and defendant was sup-
posed to have known only one girl, because he was new
in town. He did not know the prosecutrix personally.

*Arthur White,* on rebuttal for the State

He is a Security Officer for the University of Chicago,
in charge of security at Goodspeed Hall. On Sunday,
May 16, 1965, that building was opened about five or ten
minutes before 1:00 p. m. At that time of year it was
open from 1:00 p. m. to 10:00 p. m. so that the students
could study.

**Opinion**

(1) Defendant claims that the evidence did not prove
beyond a reasonable doubt that his act of intercourse with
the prosecutrix was performed "by force and against her
will." Ill Rev Stats (1963), c 38, § 11–1. He claims that
her cooperative behavior showed sufficient voluntary
submission to amount to consent. He points to such facts
as her removal of her own clothes, her failure to cry out,
even when another woman entered the rest room, and her
hesitancy in telling anybody and in calling the police.

 Defendant argues that to prove the crime of
rape against a female who has the use of her powers and

218

faculties, the evidence must show such resistance as will demonstrate that the act was against her will; citing People v. Scott, 407 Ill 301, 95 NE2d 315, and other cases. There is, however, no set and definite standard as to the degree of force or amount of resistance required. It is a determination which must be made from the facts and circumstances of each case. People v. Smith, 32 Ill2d 88, 203 NE2d 879; People v. Faulisi, 25 Ill2d 457, 185 NE2d 211. It is true that when the alleged victim retains the power to resist, voluntary submission, no matter how reluctantly yielded, amounts to consent. People v. Rossililli, 24 Ill2d 341, 181 NE2d 114. On the other hand, resistance is not necessary under circumstances where resistance would be futile and endanger the life of the female, as where the defendant is armed with a deadly weapon. Likewise, resistance is not necessary where she is so overcome by superior physical strength or paralyzed by fear that she would be powerless to resist her assailant. People v. Faulisi, 25 Ill2d 457, 185 NE2d 211; People v. Smith, 32 Ill2d 88, 203 NE2d 879; People v. Elder, 25 Ill2d 612, 186 NE2d 27; People v. Oatis, 74 Ill App2d 103, 220 NE2d 71; People v. James, 62 Ill App2d 225, 210 NE2d 804.

It appears, from the unshaken testimony of the prosecutrix in this case, that she was overpowered by defendant in a building that was almost deserted. He was described as six feet tall and weighing about 190 pounds. She stood five feet, five inches tall and weighed 117 pounds. He held her mouth in such a way that it was difficult to breathe, and from time to time displayed a long-bladed knife. He forced her to enter a toilet stall, and locked the door behind him, his body blocking even that means of escape from the cramped space. Further, no reasonable prospect of assistance in the practically deserted building was present to respond to any cry for help. From this testimony it is apparent that resistance would have been futile and would have endangered the

life of the prosecutrix. Indeed, resistance would have been foolish under the circumstances.

To sustain a conviction for rape, the testimony of the prosecutrix must either be clear and convincing in the light of all the evidence, or be corroborated by other facts and circumstances. People v. Qualls, 21 Ill2d 252, 171 NE2d 612; People v. Oatis, 74 Ill App2d 103, 220 NE2d 71. We believe that the testimony of this prosecutrix was sufficient by itself to sustain the conviction, but it was also corroborated by other evidence which supports the jury's decision. Kinds of evidence present here, which have been recognized as strong corroboration, are: a complaint by the victim soon after the occurrence (or at first opportunity), People v. Scott, 407 Ill 301, 95 NE2d 315; proof or admission of intercourse by the defendant, People v. Smith, 32 Ill2d 88, 203 NE2d 879; and the physical appearance of the victim after the occurrence, People v. James, 62 Ill App2d 225, 210 NE2d 804. Here, there is the testimony of Miss Lichtenstein that she saw the prosecutrix leave the library, and that upon her return approximately a half hour later, she was pale, nervous, and shaking; that the prosecutrix told her of the occurrence while in a very agitated state; and that she called the police because the prosecutrix was too frightened. We conclude that the failure of the prosecutrix to offer physical resistance in this case did not, by any means, amount to the giving of her consent.

The question of the credibility of the witnesses is, of course, a matter essentially for the jury's determination. In this regard, we note that there was contradictory evidence on matters other than whether force was used. Defendant testified that he had phoned the prosecutrix at the dormitory before the incident and that, since he couldn't pronounce her last name, he couldn't reach her. The prosecutrix, who was the first witness, testified that she had not received a call before the incident, but that a man had called the dormitory the day

after the incident and asked for "the girl who works in the art library," whose name he didn't know. This is in accord with her statement that she had not given him her phone number prior to the incident.

The prosecutrix testified that she never went out to lunch, whereas defendant stated that he had seen her twice at lunch time, once in the park and once at a lunch shop.

Defense witness Pace, a coemployee of defendant as an animal technician, testified that he introduced defendant to his present fiancee; that he had seen defendant with the prosecutrix about a week prior to May 16 as defendant was coming back from lunch; that he didn't know her features or face, and her back was to him; that defendant told him that he had just lunched with his girl friend and he knew defendant had reference to the prosecutrix "only because he had told me before, a couple of days before, that he had been having lunch and seeing her at the time. And this was the only girl he was supposed to have known at the university because of his newness." Yet defendant testified that he was introduced to his present fiancee at the laboratory by a technician on May 7, the day he started work, and that he had been at her home three or four times, maybe more, prior to May 15.

Defendant testified he came to Chicago in 1965, but didn't remember the exact date; he went to work at the university on May 7. Witness Pace testified that he first met defendant when the latter first came to work at the university; it was around the first of the year.

■ In view of the conflicts in testimony between defendant and the other witnesses, even including his own "supporting" witness, it is not surprising that the jury believed the straightforward account of the prosecutrix.

■ (2) Defendant next contends that there was trial error both in the introduction against him of evi-

221

dence concerning separate and unrelated crimes, and in repeated reference to defendant's silence when he was taken before the prosecutrix on June 3, 1965. First, defendant points to the testimony of the arresting officer, Fred Hills. Hills stated that defendant had no explanation for his presence in the Harper Library. He went on to say:

> And we were looking for a man for rape. We had about three or four rapes at the time in that area, there were three or four different fellows we were looking for, and he fit the description of him, so we placed him under arrest and took him to the security office.

Defendant seems to be under the impression that the reference to "three or four rapes" amounted to an accusation that he had committed them. That is simply not correct, however, as the statement in no way implicates the defendant in any other offense than that for which he was on trial. It merely explains the reason for arresting defendant at that time. The general rule excluding evidence of the commission of other crimes by an accused, is inapplicable under the facts of this case. People v. Cage, 34 Ill2d 530, 216 NE2d 805; People v. Gleason, 36 Ill App2d 15, 183 NE2d 523.

Defendant also claims that he was prejudiced by reference to defendant's silence, when confronted with prosecutrix in the hospital. Officer Hills stated that defendant said nothing when he was identified as the assailant. The State's Attorney referred to this incident several times in his closing argument, both to discredit defendant's testimony and to infer an admission. To establish such a tacit admission, it must affirmatively appear that the defendant knew he was being asked about the crime for which he is on trial, for it is the assumption that one similarly situated would ordinarily deny imputation of guilt. In such a situation, evidence of this sort is

received with great caution, and only when the conditions which make it admissible clearly exist, because there are some circumstances in which it is not reasonable or opportune to respond. When such failure to respond is admissible, the prosecutor may comment upon it during his argument to the jury. People v. Aughinbaugh, 36 Ill2d 320, 223 NE2d 117; People v. Smith, 25 Ill2d 219, 184 NE2d 841; People v. Bennett, 3 Ill2d 357, 121 NE2d 595. It appears that defendant knew of the charges and, under the circumstances, the opportunity for response was clearly present, and it would have been reasonable for him to reply. Not only was he brought before a girl he claimed as an acquaintance, who had consented to have intercourse with him, but the police had him repeat remarks which the prosecutrix said he had made on the day of the occurrence.

If error were considered to exist on this point, we do not believe it to have been so prejudicial, under all the circumstances of the case, as to require reversal.

(3) Defendant next contends that the mitigation hearing did not adequately supply the sentencing judge with sufficient information. Such mitigation and aggravation hearings are controlled by statute. Ill Rev Stats (1963), c 38, § 1–7(g). It reads as follows:

> For the purpose of determining sentence to be imposed, the court shall, after conviction, consider the evidence, if any, received upon the trial and shall also hear and receive evidence, if any, as to the moral character, life, family, occupation and criminal record of the offender and may consider such evidence in aggravation or mitigation of the offense.

The object of this statute is to carry out the apparent legislative policy of avoiding arbitrary punishment, and to guarantee, so far as possible, that the penalties imposed on convicted persons will be proportionate to the

offense and tailored to the past record and rehabilitation potential of the offender. See Ill Rev Stats (1963), c 38, § 1–2(c), (d). When such a hearing is held, however, the sentencing judge is limited by what the parties present for his consideration. People v. Smith, 62 Ill App2d 73, 210 NE2d 574. Although there was no presentence investigation in the present case, the court had sufficient evidence before it to decide intelligently on the proper sentence. After the jury was discharged, the trial judge specifically asked for a hearing in aggravation. The prosecution then pointed out the seriousness of the offense and asked for a sentence of 30 to 60 years. The trial judge then specifically asked for a hearing on mitigation. At that time defense counsel emphasized defendant's youth and previously clean record, and asked for a merciful sentence. The judge, on his own inquiries, elicited information on defendant's background, and then imposed the 20-to-40 year sentence. More could not reasonably have been required of the judge in this regard, and we consider the mitigation hearing to have been adequate.

(4) Finally, defendant says that the sentence imposed was excessive in view of the youthfulness of the defendant, and requests this court to reduce the sentence, under the authority of Supreme Court Rule 615(b)(4). Ill Rev Stats (1967), c 110A, § 615(b)(4). This power, however, should be applied with great caution, and we do not believe that the facts of this case present an appropriate occasion for its exercise. People v. Taylor, 33 Ill2d 417, 424, 211 NE2d 673.

**Decision**

The judgment of the Circuit Court is affirmed.

Affirmed.

McCORMICK, P. J. and DRUCKER, J., concur.