THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DOUGLAS JONES *et al.*, Defendants-Appellants.

First District (4th Division)    No. 59317

Opinion filed April 28, 1976.—Rehearing denied August 31, 1976.

Melvin B. Lewis, of Chicago, for appellant Douglas Jones.

Paul Bradley, of State Appellate Defender's Office, of Chicago (Allen Wiederer, of counsel), for appellant Lytton Parkman.

Tyce S. Smith, of Chicago, for appellant Milton Harvey.

Richard J. Loeffler, of Van Duzer, Gershon, Jordan & Petersen, of Chicago, for appellant Jeffrey Coleman.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda Ann Miller, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendants Douglas Jones, Lytton Parkman, Milton Harvey, and Jeffrey Coleman were jointly indicted on charges of rape (Ill. Rev. Stat. 1971, ch. 38, §11—1) and deviate sexual assault (Ill. Rev. Stat. 1971, ch. 38, §11—3). Each was convicted after a bench trial and sentenced to a term of 4 to 12 years. All four defendants appeal to this court for reversal.

According to the testimony of the complainant, on July 24, 1972, at approximately 1 a.m., she and her sister arrived by taxicab at the Nice and Easy Lounge, a club located on East 87th Street in Chicago. She had been to the club at least two Saturdays per month for the previous 7 or 8 months and usually encountered the same group of people. The witness testified that she went to the lounge to dance, not to drink or meet young men. She ordered one drink and danced during the course of her stay with several individuals, including defendant Lytton Parkman. Complainant observed two other defendants, Milton Harvey and Jeffrey Coleman, but did not dance with either.

At about 4 a.m., she left the lounge, unaccompanied, and stood outside to breathe fresh air because the club was hot and smoky. Harvey approached her and inquired as to her reasons for leaving. She explained and, in the course of the conversation, Parkman appeared and said to Harvey, "Man, what are you doing, standing out here talking to my lady?" Complainant asked Parkman what he was talking about since, as she

testified, she had never dated Harvey or any of the other defendants. Parkman pushed complainant and she told him to "Go ahead" which she testified meant "Leave me alone." Harvey then began to push her. Since she considered their conduct to be playful, she was not afraid of them. Parkman then picked her up and pretended to put her into a trash can situated near the club. She told him to put her down.

After this, the two began pushing her toward the parking lot. Although she still was not in fear, she became angry and demanded that they leave her alone. When one of them hit her hard, she struck back at him. Coleman, who had recently appeared, shouted, "Man, you should kick that [obscenity], because she thinks she's top flight" and also, "Man, you let her hit you like that. The broad thinks she's bad." The witness stated that the mood changed at this point. Harvey and Parkman took her by the arms and started pulling her, saying that they were going to "pay her back." They proceeded to carry or drag her down the street away from the lounge. Complainant began to scream and Harvey applied painful pressure to her arm. After being taken 2 or 3 blocks, she again heard Coleman making comments similar to his previous statements. During this time, she pleaded with them to let her go, told them that they must have been out of their minds, and continued to scream. No one responded to her cries. She testified that she tried to resist being taken away by tugging and pulling at their grip on her.

Complainant was taken 5 or 6 blocks, dragged up the front steps into a house which was dark, and then down some stairs into a basement. Parkman pushed her into a room with a light on and closed the door. He told her that the only way she could get out was to take off her clothes. Complainant unsnapped her belt and Parkman pulled down her pants and panties and assisted in taking off her blouse and bra. He told her she had to "sex him up." When asked what he meant, he replied that she knew how to do "head jobs." The witness stated that she did not know what he was talking about. Parkman then stated, "You're not going to leave here until you sex me up." He pushed her head down and struck her on the back of it when she resisted his efforts. He then engaged in an act of fellatio. During this time, Harvey came into the room and told Parkman to hurry because he was "in on it too," and then left. Parkman told complainant to lie down and subsequently had intercourse with her. Harvey returned, insisting that it was taking too long, and then left again. Parkman told her to "sex him up" one more time and he would get her out of the house. He then engaged in another act of fellatio.

After a sudden commotion outside, Coleman, Harvey, and Douglas Jones entered the room. One shouted, "Man, what are you doing. The [obscenity] probably got you thinking that she's going to deal with you afterwards, man. What's the matter with you. I want mine." Coleman

called complainant a whore and said that she wanted to be paid. She denied this and begged them to let her go. She started to scream and Jones told her to shut up. The three left the room and closed the door. Still crying, the witness asked Parkman to let her go. He then stated, "Just be cool. I'm going to get you out because I don't know why I brought you down here anyway. I'm going to get you out * * *. These are my partners. These are the people that I make money with. They're going to hate me for this. I'm going to get you out." Parkman left the room at this time.

When he returned, Parkman told her to put on her clothes and he would get her out of there. After they dressed, he asked her to hold his hand and not let it go, regardless of what happened. She did so. Parkman then opened the door and they exited the room. Coleman and Harvey immediately confronted them and objected. Harvey pulled complainant back into the room and demanded that she take off her clothes. He snatched her pants and underwear down and pulled off her blouse. He told her to "shut up and lay down." Coleman entered the room briefly to tell him to hurry. Harvey then had intercourse with complainant for about 10 to 15 minutes.

Coleman returned after Harvey had left and said that she would have to "do a head job" and to "shut up crying." He then proceeded to engage in an act of fellatio with complainant while she was crying. The witness testified that Coleman became angry because she was not performing to his satisfaction and hit her on the back of the head at least twice. He then had intercourse with her.

Thereafter, Jones entered the room and said that he was the last one and then she could leave. He also engaged in an act of fellatio. He subsequently began to have intercourse with complainant but ceased because he "couldn't stand all that [obscenity] crying." When Jones dressed, the others entered the room. Coleman asked her if she was all right and if she wanted something to eat or drink. She answered, "Just let me out."

Parkman stated that he was going to get his father's car keys and take her home. Coleman, Jones, and Harvey left the house at this time. When complainant was fully dressed, she and Parkman went upstairs into the kitchen. He said that she "looked a mess" and that he could not take her home like that. He then brought a brush for her hair and went into the living room. When she finished brushing her hair, Parkman told her to sit in a chair. It was light outside by this time.

At that point, Parkman's father entered the living room. Complainant testified that she was still crying and did not say anything to him because she was afraid. Parkman asked for the keys to the car but his father said he wanted to get some cigarettes. While he was gone, complainant told

Parkman that she could not sit there any longer, that she had to leave. He said that she could go and opened the door. By this time, his father had returned and Parkman received the keys. He told her to get into the car and then drove to her apartment building.

According to her testimony, the witness went into the building and buzzed her apartment since she did not have a key. No response was forthcoming, so she walked outside to a phone booth and dialed her number. When her sister answered the phone, complainant informed her of the rape and asked to be let into the building. When she entered the apartment, she began crying hysterically and attempted to relate the details of the occurrence.

After being calmed down, complainant called the police who took her to a hospital. She was examined by a doctor and given shots to prevent venereal disease. Her arms were red and hurt where pressure had been placed upon them, but she did not receive any treatment for cuts and bruises. Investigators Springer and Dudek accompanied complainant when she left the hospital. They asked if she recalled the location of the house. After driving around the vicinity, she remembered the name of the street and eventually they found the house. Springer exited the car and entered the Parkman home. He came out with defendant Lytton Parkman.

The witness testified that all the acts of intercourse and deviate sexual assault with the four defendants were against her will. She also denied soliciting money from any of them.

Complainant's sister was called to testify concerning the events which occurred on the morning of July 24, 1972. She stated that complainant phoned between 8 and 8:30 a.m., and thereafter she answered the buzzer to admit her into the building. Complainant fell into her arms and cried, "They raped me." She was hysterical and it was difficult to understand her. The witness sat complainant on the bed and asked what had happened. She replied, "They took me. I didn't leave you. They raped me," and kept asking, "what am I going to do?" The witness told her to call the police. She testified that her sister's eyes were red but not puffy.

On cross-examination, the witness stated that she remained inside when her sister left the club, and stayed there until closing time which was about 5 a.m. She then noticed that complainant was not present, but did not call the police or worry because her sister was not home when she arrived about 6 a.m. However, she walked around the neighborhood looking for her before going home.

A laboratory report which contained the results of a vaginal smear from the complaining witness was entered into evidence by stipulation. The smear was positive for spermatozoa, indicative of the presence of sperm.

The hospital emergency room record was also admitted into evidence pursuant to a stipulation.

Gerald Springer, the officer who investigated the complaint, was called as a witness by defendants. According to his testimony, he first saw complainant in the hospital emergency room where she was being interviewed by two police officers. Springer and his partner asked her certain questions and a written report was made on the investigation. He did not recall her mentioning that one of the defendants said words to the effect that "you better hold me down or I am going to do what I did to the last whore before." The officer further testified that if she had made such a statement, he would have followed through and made further investigation on other offenses. He also testified that the complainant said she had been fondled by all four defendants prior to being raped and deviately assaulted. On cross-examination, he said that his report was only a summary of what the complainant had told him.

Robert Dudek, Springer's partner, was also called by defendants. He also did not recall the complaining witness mentioning that she overheard words which implied that defendants had been involved in another rape. He testified on cross-examination that he did not make a verbatim copy of the statements of the complainant. When he first saw her in the emergency room, she was nervous.

Mr. Lytton Parkman, Sr., the father of defendant Parkman, testified on defendants' behalf. On July 23, 1972, he arrived home at 9 p.m. He went to sleep in his bedroom, which was located on the ground floor, and was not awakened during the night. Upon arising at about 6:30 or 7 a.m., he left his bedroom and entered the living room. Mr. Parkman saw complainant sitting on the couch, and his son in a chair on the other side of the room. The two were talking in normal voices. Mr. Parkman testified that he did not notice anything unusual about complainant and that she was not crying. Neither spoke to the other. He said that he was going to a service station for cigarettes and asked his son if he wanted anything. Young Parkman requested a can of soda. When he returned 10 or 15 minutes later, complainant was standing on the porch with his son. Mr. Parkman gave the soda to him and went inside the house. His son then came back into the house and obtained the car keys. He testified that the defendant did not ask for the keys in complainant's presence and was alone when he came back into the house to request them.

Two issues are raised on appeal by all defendants: (1) whether defendants were proved guilty beyond a reasonable doubt and (2) whether defendants were denied effective assistance of legal counsel. Defendants Parkman and Jones present for review the issue of whether they were unreasonably restricted in cross-examination of complainant.

Defendant Jones questions whether, in the absence of any showing of force on his part or of any resistance by complainant, he can be found guilty of rape and deviate sexual assault.

■■ Defendants contend that the State failed to prove their guilt beyond a reasonable doubt, alleging the evidence was insufficient to show that the acts were committed by force and against complainant's will. We start with the proposition that there is no definite standard for fixing the amount of force required for rape, and each case must be considered on its own facts. (*People v. Jackson* (1968), 103 Ill. App. 2d 209, 219, 243 N.E.2d 551.) However, although a reviewing court is charged with a duty to exercise the utmost caution in examining evidence in a sex offense prosecution stemming from clandestine circumstances, it will not disturb the determination of the trier of fact on such matter unless the evidence as a whole is so unsatisfactory as to raise reasonable doubt of guilt. *People v. Alexander* (1973), 11 Ill. App. 3d 782, 790, 298 N.E.2d 355.

In this case, complainant testified that she was dragged away from the club by two of the defendants, that painful pressure was applied to her arms to prevent her from screaming. She was pushed into a basement room and told that she would not be permitted to leave until she undressed. This evidence, coupled with the fact that three other assailants stood just outside the room, is sufficient to establish beyond a reasonable doubt that the acts were committed by force.

Defendants also contend that the State failed to prove its burden of showing that the acts were against complainant's will. They allege that complainant voluntarily removed some of her clothing and failed to fight off her attackers or put up effective resistance. They also argue that she was not restrained by being held down or threatened either verbally or with weapons. Despite defendants' contentions, a rape victim need not resist in circumstances where it would be futile, would endanger her life, or where she is overcome by superior strength or paralyzed by fear. (*People v. Browder* (1974), 21 Ill. App. 3d 223, 229, 315 N.E.2d 168.) Complainant testified that while being taken away, she tried to loosen defendants' grip on her arms by tugging and pulling. She also screamed, cried and begged them to let her go. While it is true that acts must be against the complainant's will, useless or foolhardy acts of resistance are not necessary. (*People v. Porter* (1973), 13 Ill. App. 3d 893, 898, 300 N.E.2d 814.) Consent to intercourse with four men will not be implied from the fact that the complaining witness did not beat her attackers. (*People v. Cruise* (1971), 130 Ill. App. 2d 923, 926, 266 N.E.2d 109.) Complainant's removal of some of her clothes is an isolated fact which does not show consent. (*People v. Simental* (1973), 11 Ill. App. 3d 537, 542, 297 N.E.2d 356.) Under the circumstances of this case, we hold that complainant's will to resist was effectively overcome and that further

active resistance would have been futile and unnecessary to sustain the convictions. *People v. Sanders* (1967), 80 Ill. App. 2d 452, 457, 225 N.E.2d 723.

Defendants next urge that complainant's failure to spontaneously complain casts reasonable doubt on her testimony. First, we note that the young woman testified that she screamed and hollered as she was being taken away, but that no one came to her assistance. Although she made no spontaneous complaint to Parkman's father, she satisfactorily explained this by her statement that she was afraid and did not want to trust him. An outcry by the complainant where it is useless or where she is restrained by fear of violence is not required. (*People v. Lilly* (1972), 9 Ill. App. 3d 46, 49, 291 N.E.2d 207.) It is also not mandatory that she disclose the rape to strangers she sees immediately thereafter. (*People v. Sims* (1972), 5 Ill. App. 3d 727, 730, 283 N.E.2d 906.) In any event, the fact that complainant did not cry out to Mr. Parkman, Sr., was a circumstance to be considered as bearing upon her credibility, but was not conclusive, and the trier of fact could properly find upon other evidence that she had been forcibly raped. (*People v. Garreau* (1963), 27 Ill. 2d 388, 392, 189 N.E.2d 287.) In addition, we note that complainant immediately told her sister of the attacks when she arrived home and promptly notified the police.

Defendants next urge that complainant's testimony failed to meet the clear and convincing standard which is required where there is no corroboration. They buttress this position with several examples of allegedly incredible acts or behavior: (1) complainant's testimony that she had only one drink while in the club for 3 hours; (2) the "uncommon concern" exhibited by defendant Parkman in attempting to help her leave before the others had an opportunity to be with her; and (3) complainant's acceptance of Parkman's offer of a ride to her building. These and certain inconsistencies in the testimony, their argument insists, renders her account inherently improbable. We agree that in order to obtain a conviction for rape, the testimony of the complainant must be either clear and convincing or independently corroborated by other evidence. (*People v. Reynolds* (1965), 61 Ill. App. 2d 349, 357, 210 N.E.2d 637.) However, we believe that the record amply demonstrates that these convictions should be upheld.

■■ The testimony of the complainant alone, if positive and credible, is sufficient to sustain a conviction for rape. (*People v. Sanford* (1975), 34 Ill. App. 3d 485, 488, 340 N.E.2d 255.) Complainant related the facts in detail and the essential elements of her testimony were unrebutted. While there may have been some minor inconsistencies or conflicts in her account, it was the duty of the trier of fact to determine whether or not the testimony was reliable. (*People v. Sanford* (1975), 34 Ill. App. 3d 485, 489, 340 N.E.2d 255.) The judge here obviously chose to believe

complainant's version. In rape cases, courts of review are charged with a special duty to carefully determine the evidence, but must be cautious not to encroach upon the function of the trier of fact to weigh credibility and evaluate the evidence presented at trial. However, contrary to defendants' assertion, complainant's testimony was corroborated. Her sister testified that complainant was hysterical when she entered the apartment and continuously cried, "They raped me." The complaining witness' prompt complaint to the police also served as corroboration of her testimony. (*People v. Sims* (1972), 5 Ill. App. 3d·727, 730, 283 N.E.2d 906.) Therefore, notwithstanding the fact that there was no evidence of bruises or scrapes, or damage to her clothing, we believe that her clear and convincing testimony, together with some corroborative evidence, was sufficient to sustain the convictions.

Defendants next contend that they were denied effective assistance of counsel because their privately retained trial counsel chose to represent all of them in a single trial despite their allegedly antagonistic defenses. It is submitted that the most effective presentation of the consent defense would have required that each defendant take the stand and state the circumstances surrounding his sexual activities, but that such a procedure would have elicited testimony prejudicial to co-defendants.

■■ The general rule is that jointly indicted defendants should be tried together, unless, in the sound discretion of the trial court, their positions are so antagonistic that a fair trial can be had only by severance. (*People v. Muersch* (1972), 4 Ill. App. 3d 1003, 1007, 282 N.E.2d 767.) Severance is neither required nor authorized where defenses of the accused are not inconsistent. (*People v. McCasle* (1966), 35 Ill. 2d 552, 556, 221 N.E.2d 227.) Each of the defendants alleged on appeal that the acts were consensual and there is nothing in the record of this case to show that the defenses were antagonistic. Naturally, each defendant attempts to construe the evidence in the light most favorable to himself; however, this does not indicate antagonistic or incompatible positions. It would be mere conjecture for this court to conclude that any of these co-defendants would be more willing to waive their constitutional privilege against self-incrimination at a separate trial. Since the defense of each co-defendant was similar, there was no basis upon which a motion for severance could have been predicated. Accordingly, we hold that defendants were not denied effective assistance of legal counsel because their attorney failed to seek a severance. Where there is no showing that a defendant has been prejudiced by counsel's representation of both him and his co-defendants, or that a different result might have been obtained had separate counsel been appointed, a court of review ought not to disturb a judgment on the basis of conjectural or speculative conflicts between the interests of co-

defendants which are envisioned for the first time on appeal. *People v. McCasle* (1966), 35 Ill. 2d 552, 556, 221 N.E.2d 227.

Defendants Parkman and Jones question whether they were unreasonably restricted in cross-examination of complainant when the trial judge refused to permit inquiry into her relationship with an attorney referred to her by Rape Crisis and the nature of the legal assistance involved. They suggest that complainant sought someone with legal knowledge to assist her in preparation of her testimony and thus assure their convictions. The record shows that on cross-examination, defendants' counsel elicited from complainant the fact that she had contacted the attorney during the week preceding trial and had related to her the events which had transpired. The trial court sustained objections to defendants' questions concerning whether complainant had hired an attorney to represent her and whether certain individuals in the courtroom were part of her "entourage." Complainant testified that they did not discuss her testimony, but that the attorney had informed her of good and bad points in the case and had discussed prior rape cases. The witness denied that the purpose of their discussion was to determine whether her testimony would successfully convict defendants. An objection to the question which elicited the latter response was sustained.

Defendants now contend on appeal that these and other unspoken questions were relevant to show that complainant's testimony might have been modified or somehow affected by her discussion with the attorney. However, as the trial judge pointed out, the complaining witness was represented by the State's Attorney. Therefore, the question of whether she hired an attorney to represent her was irrelevant to any issue in the case. Objection was also properly sustained on the same ground to the inquiry concerning the individuals who were alleged to be accompanying complainant on the day of the trial. While defense counsel in a criminal trial should be accorded the widest latitude in his cross-examination of adverse witnesses so as to reveal any possible bias or prejudice, the extent of the defense counsel's inquiry rests within the sound discretion of the judge and only when such discretion has been clearly abused to the manifest prejudice of the defendant will a reviewing court interfere. *People v. Thomas* (1974), 18 Ill. App. 3d 306, 312-13, 309 N.E.2d 744.

To predicate error on the court's refusal to permit a witness to answer, defendants were required to make an offer of proof as to what the testimony of the witness would have been, and preserve their objection to the ruling after making such offer of proof. (*Logue v. Williams* (1969), 111 Ill. App. 2d 327, 339, 250 N.E.2d 159.) The record does not disclose that defendants made any statement of what they assumed complainant would answer, or indicate what they expected to prove by this witness. In

addition, they did not seek to introduce other evidence which would tend to show that her testimony was altered. Under these circumstances, it can not be said that the trial court abused its discretion to the manifest prejudice of defendants.

Defendant Jones raises the following issue: In the absence of any showing of force by this defendant, or of resistance by complainant, can he be found guilty of rape and deviate sexual assault? Jones correctly points out that there was no evidence that he was at the club, or that he was present or involved in complainant's abduction. In his view, the evidence does not warrant the conjecture that he had any knowledge that force or violence had been used against her. Jones would have this court believe that he was an innocent participant sharing the favors of a young woman who, for all he knew, was a prostitute and, consequently, was unaware that her participation was the product of threats or force applied in his absence. We are not persuaded by this argument.

In response to Jones' contention that complainant did not resist, we reiterate our holding that in this situation complainant's will to resist was effectively overcome. When Jones entered the room, she had already been raped by three persons and deviately assaulted by two of them. Jones announced that he was the last and then she could go. After engaging in an act of fellatio, he then commenced to have sexual intercourse with her, but subsequently withdrew because he could not tolerate complainant's crying. We find no consent in this situation. Any further acts of resistance on her part would have been futile, dangerous and unnecessary to sustain the conviction.

The trial court found defendants guilty in the manner and form charged in the indictment and sentenced each to a term of 4 to 12 years in the penitentiary. While there is precedent for the imposition of separate sentences for rape and deviate sexual assault (*People v. Moore* (1972), 51 Ill. 2d 79, 88, 281 N.E.2d 294), the trial court gave a single sentence for both offenses. We believe that the judge attempted to follow the rationale of *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1, by entering only one sentence. We therefore affirm the conviction for rape and sentences for terms of 4 to 12 years and vacate the conviction for deviate sexual assault.

Affirmed in part; vacated in part.

ADESKO and BURMAN, JJ., concur.