THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL EDWARDS, Defendant-Appellant.

First District (5th Division)   No. 78-1354

Opinion filed September 28, 1979.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendant was found guilty of rape (Ill. Rev. Stat. 1975, ch. 38, par. 11—1), unlawful restraint (par. 10—3) and contributing to the sexual delinquency of a child (par. 11—5) and was sentenced to

concurrent terms of 7 to 14 years for rape and 1 to 3 years for unlawful restraint. On appeal, he contends he was denied a fair trial when: (1) the prosecutor commented on his failure to testify; and (2) the trial court unduly restricted cross-examination of the victim of the rape. We affirm.

The 16-year-old rape victim testified that she was single, stood five feet two inches tall, and weighed 90 pounds at the time of the incident. The rape occurred in the early morning hours of March 27, 1977. At a little before midnight on March 26, the victim left her home, apartment #705 at 730 East 39th Street, and went to get some food at a restaurant which was located about five blocks from her apartment and in the vicinity of a high school. The walk to the restaurant took about 20 minutes. The victim did not talk to anyone while she was at the restaurant, and, after about a five minute wait, she took the food which she had ordered and began to walk back to her apartment. On the way, she met Claude, a friend of hers, and talked with him for about 15 minutes. The victim then left Claude and returned to her building.

At the building, the victim pushed the elevator button for the elevator which travelled to the odd numbered floors, but the elevator for the even numbered floors arrived first. As it arrived, someone grabbed her from behind and she began screaming for help and crying out that someone was trying to rape her. She scratched her assailant on his left arm and tried to bite him. He then changed his position and stood facing her. Since the area outside the elevators was lighted, the victim could clearly see her assailant and later, she identified him as defendant. Defendant grabbed her and began pulling her by the hair closest to her right temple. She struggled with him for about five minutes, but he succeeded in dragging her onto the lighted elevator.

On direct examination, the victim stated that once she was on the elevator, defendant slapped her and told her to "shut up." On cross-examination, she stated that after she got on the elevator, defendant began "sweet-talking" her, asking her if she would be his lady. On redirect, however, she stated that defendant sweet-talked her after the rape. In any event, after the elevator door closed and the elevator began moving, defendant stood in front of her with his hand in his left pocket. She thought that defendant had a gun "or something" in his pocket. Eventually, defendant pushed a button and stopped the elevator. The victim repeatedly asked defendant to let her go, but he would not and told her that if she screamed he would kill her. After a while, he told her to take off her clothes and, if she did not, he would not let her go. Defendant was standing only two or three feet away from her when he made this threat and his hand was still in his left pocket. The victim eventually realized that her resistance would be futile and took off her clothes. Defendant then raped her. About 20 minutes later, she put her

clothes back on and told defendant that if he let her go she would not tell anybody about what happened. He then told her that he wanted to take her for a drink and he released the stop button on the elevator. The elevator rose to the top floor and the doors opened. The victim did not try to get off the elevator because defendant again had his hand in his left pocket. The elevator then descended to the ground floor.

When the door opened, the victim saw Donald Nobles standing in the corridor and she told him that defendant had raped her. She was crying at the time. Nobles, who knew defendant, told him not to run and then began talking with him. The victim overheard defendant telling Nobles that he had not done anything to her. While Nobles was talking to the defendant, Dorothy Banks, a neighbor and the mother of the victim's boyfriend, Kenneth, took the victim into her apartment. She told the victim to go upstairs and wake up Kenneth. When she and Kenneth came downstairs, Dorothy was on the phone talking to the police and defendant was standing in the doorway. Kenneth went over to talk to defendant. After standing in the doorway for about 15 minutes, defendant left.

Eventually the police arrived and took the victim to the hospital for treatment. There, a nurse wiped some blood off an area of her head near to her right temple. The victim stated that she never showed this area to the attending physician.

Both sides agreed to a stipulation that if the attending physician were called, he would testify that he noticed no evidence of trauma visible in the form of fresh bruises or scratches on the victim. He would also testify he obtained a smear and swab specimen from the victim's vagina and that he turned it over to a police microanalyst. The microanalyst testified that his examination of the specimen indicated the presence of human spermatozoa.

Donald Nobles, a resident of the victim's building, testified that he arrived at the building in the early morning hours of March 27 with his sister and Dorothy Banks. He first went into Dorothy's apartment with her but, after staying five minutes, he left and went to the building's parking lot to get a couple of bags from his car and then to lock it. When he returned to the building, he knocked on Dorothy's door. While waiting for her to answer, the elevator opened behind him and first the victim stepped out, and then defendant, who Nobles had known from school, stepped out from behind her. Nobles said that the victim looked upset. After about a minute, she came over to Nobles and told him that defendant had raped her. She then began crying. When she again told him that defendant had raped her, he asked defendant if this were true. Defendant denied it. Nobles then again knocked on Dorothy's door and

Dorothy let the victim into her apartment. Dorothy then called the police. The police arrived 15 minutes after Dorothy made the call. In the meantime, both Nobles and Kenneth had talked to defendant who was standing in the doorway. After they went back into the apartment, defendant left.

Dorothy Banks testified that after Nobles had left her apartment to go to his car, she waited five to ten minutes and then went to the door to see if she could see him outside. She heard a girl screaming that she was being raped on the elevator. Dorothy waited for a few minutes, but did not do anything because she figured that it was just "kids playing." Also, at the time she saw a man getting on an elevator and she figured that he would rescue the person if she really needed help. Dorothy then went outside to see if she could find Nobles. On the way, she saw his mother and she talked with her for a few minutes. Eventually, she went back into her apartment.

About 5 or 6 minutes after the scream, Dorothy heard a knock on her door. She opened the door and saw Nobles, defendant, and the victim. She said that the victim looked frightened and was crying. The victim walked into Dorothy's apartment and told her that defendant had raped her. Dorothy called the police. While she was making the call, both her son, Kenneth, and Nobles talked with defendant who was standing in the doorway. She heard Kenneth telling defendant: "Oh no. You couldn't have done this. You know me and you know that is my lady." She also heard defendant denying the rape to Kenneth. After Nobles finished talking with defendant, Dorothy told defendant not to leave. After having stood in the doorway for about ten minutes, defendant "took off."

Officer Joseph Cosentino testified that at about 3:45 a.m. on March 27, he received a call that there was a rape victim at 730 East 39th Street. He went to that address and spoke to the victim and others in an apartment in which Donald Nobles, Dorothy Banks, and another woman were present. Based on his conversations with some of these people, he determined that the rape had occurred at about 3:20 a.m. When he spoke to the victim she was upset and appeared to have been crying. Also, he noticed that she had a scratch above her right eye, near the hairline. She told him that she had been raped and provided him with a fairly detailed description of defendant. She also told him that defendant had fled the scene as soon as he had seen Nobles.

Officer Robert Stephenson testified that, acting upon a tip and the description of defendant given by the victim, he arrested defendant in an apartment at about 5:30 p.m. on March 27. He took defendant down to the police station where the victim identified her assailant. Afterwards she told him that during the struggle on the elevator she had scratched

defendant on the left arm. Stephenson then asked defendant to roll up his left sleeve. When he did, Stephenson noticed a scratch about one-half inch long, approximately 3 or 4 inches above the wrist.

OPINION

Defendant contends that his fifth amendment privilege against self-incrimination was violated by the prosecutor's rebuttal argument comment on his failure to testify. The assistant State's Attorney told the jury:

> "Mr. Cohn [one of the defense counsels] offered a theory about [the victim] going to look for people, looking for something to do and that she met up with the defendant and they did something, somewhere someplace and we don't know what they did. Then, they came down on the elevator later. Well, I ask you ladies and gentlemen, whatever evidence there is to support that anything happened other than what [the victim] testified happened, there are only two people who know from firsthand knowledge what happened in that elevator and one of them was [the victim] and she got up on that witness stand and she testified under oath and she told you what happened and let me tell you this, the other person was not Mr. Cohn. Mr. Cohn gave an argument and it is a lawyer's argument and—."

The defense counsel moved for a mistrial immediately after these statements were made. However, the court denied the motion but instructed the jury to disregard the assistant State's Attorney's statement with reference to Mr. Cohn. Defendant claims that the assistant State's Attorney's comments were "intended or calculated to direct the attention of the jury to defendant's neglect to avail himself of his legal right to testify" and, as such, necessitated a new trial. Plaintiff on the other hand argues (1) that these comments were of no more than comments made on the uncontradicted nature of its case and, as such, were proper; (2) these comments, even if improper, were provoked by the statements of the defense counsel; and (3) these comments, even if improper, were harmless beyond a reasonable doubt. We find that the comments were improper but that they were harmless beyond a reasonable doubt.

■■■ In *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, the United States Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids * * * comment by the prosecution on the accused's silence * * *." (380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, 1233.) In Illinois, prosecutorial comment violates the fifth amendment if it is intended to direct the jury's attention to the defendant's decision not to take the

witness stand. (*People v. Mentola* (1971), 47 Ill. 2d 579, 268 N.E.2d 8.) Courts have found that the following comments have been intended to direct the jury's attention to the defendant's decision not to take the witness stand:

" 'And then he's [defendant] got to explain the blood on the pants. * * * Do we hear one iota of evidence that he did cut himself? No. * * * There is no explanation for that blood on his pants from him but there is an explanation.' " (*People v. Burton* (1969), 44 Ill. 2d 53, 55-56, 254 N.E.2d 527, 528.)

" 'Ladies and gentlemen, you will be returning soon to the jury room to deliberate upon your verdict. Remember there is only one defendant on trial, Anthony Wollenberg. There was [*sic*] only eight witnesses in this case. No one else testified in this case, Mr. Wojcik, Officer Paholke, Officer Sparks and Officer Bischof, Mr. Kaplan and Mr. Wallace testified on behalf of the State. On behalf of the defendant, just two witnesses, Mr. LaBuda and Mr. Lazendorf. No one else testified. Let's get that straight.' " (*People v. Wollenberg* (1967), 37 Ill. 2d 480, 487, 229 N.E.2d 490, 494.)

" 'Parker [the only other witness other than defendant] told you all these things and yet Mr. Green [defense counsel] is putting him on as his only witness in his case.' " (*People v. Martin* (1975), 29 Ill. App. 3d 825, 831, 331 N.E.2d 311, 315.)

" 'You have only the testimony of the officer. You have no other testimony at all as to what actually occurred and I think you are going to have to take that for the truth, of what was said, the officer's version of it. That is all you have before you.'

* * *

'I wasn't there. Defense counsel wasn't there. The defendant was there. Noel Oliver was there. But you twelve people were not there * * *. I ask you, where is the testimony? Where is the evidence? Where is the evidence that shows that the defendant handed or waived this bill under the officer's nose for the innocent purpose of, here is the first installment on this bond. We don't have it. There isn't any evidence * * *. Where is the testimony of the innocence of these statements? There isn't any. The only person that testified is this officer * * *. He was there. He saw. He heard, and he has testified. He is the only one who has testified. It appeared to him, and you have only his testimony that the actions of the defendant amounted to a bribe.' " (*People v. Mostert* (1976), 34 Ill. App. 3d 767, 771, 340 N.E.2d 300, 303.)

On the other hand, prosecutorial comment does not violate the fifth amendment if it is a mere reference to the uncontradicted nature of the evidence in the case. (See, *e.g., People v. Mentola* (1971), 47 Ill. 2d 579,

268 N.E.2d 8; *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.) Our review of the leading cases indicates that a comment will be construed as a reference to the uncontradicted nature of the case provided there is no direct or indirect reference to the defendant's failure to take the witness stand.

The assistant State's Attorney's comments in this case constituted an indirect reference to the defendant's failure to take the witness stand. Although the State claims that all he was doing was responding to the defense counsel's theory of the case, we believe that the message which he intended to communicate to the jury is clear: defendant did not take the witness stand. This was improper. Under different circumstances, such clearly improper comments would necessitate a new trial. However, in light of the overwhelming proof of defendant's guilt and the repeated admonitions of the trial court, the error was harmless beyond a reasonable doubt. See *People v. Mostert* (1976), 34 Ill. App. 3d 767, 340 N.E.2d 300.

Defendant claims that the fact that it took the jury six hours to reach its decision is indicative of the closeness of the proof in this case. We cannot agree. The length of jury deliberations is subject to so many interpretations and explanations that it cannot be the sole basis for a finding that there was a reasonable doubt of defendant's guilt. Defendant has not offered us any other reason to believe that the proof in this case was close. Upon careful review of the record, we find no such reason. The mere fact that there may have been a time gap in the victim's recitation of the events occurring in the early morning hours of March 27 does not alter our conclusion since proof beyond a reasonable doubt does not require proof beyond any possible doubt. *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.

Furthermore, we find that the trial court's repeated admonition to the jury either to not consider the defendant's not taking the witness stand in reaching its verdict or to ignore the comments when made contributes to the harmless quality of the prosecutor's comments. The court admonished the jurors during jury selection, immediately after the comments were made, and during the giving of the instructions in the case. When we consider this factor in conjunction with the overwhelming nature of the evidence in this case, we cannot say that a new trial is required.

Defendant also contends that he was denied his right to confront witnesses against him when the trial court granted the State's motion *in limine* to exclude any reference to the fact that the victim was the mother of a one-year old child. He claims that this fact had probative value in that knowledge of the child could have provided a possible explanation for the scratch on the victim's forehead. We reject this contention.

The trial court has discretion to determine the scope of cross-examination, and, absent an abuse of discretion, the trial court will not be

reversed on appeal. (*People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170; *People v. Kilgore* (1976), 39 Ill. App. 3d 1000, 350 N.E.2d 810.) In rendering its decision on the State's motion, the trial court had very little to go on. Defendant neither made an offer of proof to the trial court that the child caused the scratch nor did he present any testimony which would indicate that the scratch had been caused by the child. (*People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375.) He merely theorized that knowledge of the child might provide a possible explanation for the scratch. Due to the speculative nature of this argument, we cannot say that the trial court abused its discretion.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.