THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE H. PORTER, Defendant-Appellant.

(No. 72-187;

Third District—August 24, 1973.

James Geis, Deputy Defender, of Ottawa, for appellant.

Edward P. Drolet, State's Attorney, of Kankakee, for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Lawrence H. Porter appeals from judgments and sentences following a conviction for rape and burglary in a jury trial in the Circuit Court of Kankakee County. Porter was sentenced to serve terms of not less than five (5) nor more than ten (10) years on each of the two counts of rape and burglary with the terms to be served concurrently.

It is contended that the State did not prove defendant guilty of rape and burglary beyond a reasonable doubt. Complaining witness and defendant testified in direct conflict and told divergent stories. The complaining witness, Betty Logsdon, on the 14th day of July 1971, the date in question, lived alone in an apartment on the second floor of an apartment building. She was 5'5" tall and weighed 114 pounds. Porter was approximately 5'10" tall and weighed approximately 135 pounds. Miss Logsdon testified that she went to sleep on July 13, 1971, at about 10:30 P.M. She awoke at about 4:00 A.M. on July 14, 1971, and found Porter sitting on her bed to her right as she lay on her back with the bed sheet and spread covering her to her neck. Porter was lying halfway over her with his arm across her and his feet on the floor. She was wearing panties at the time.

As Miss Logsdon awoke she stated that Porter said, "Oh, Joan, Honey, I'm sorry I'm drunk and home so late." Miss Logsdon told Porter he was in the wrong apartment. He said, "You're right. Honest to God, I'm sorry that I scared you." The girl asked Porter to leave and also asked him how he had entered. He said he came through the doorway. She told him that was not true because she had locked the door. She noticed that the bedroom curtains were blowing and the screen had been pulled out. She told Porter he had come through the window and he admitted that he had come in through the window.

Porter then said that he wanted to meet her for a long time but had not known how. He repeatedly said he was sorry he had threatened her and would not hurt her. During this period of approximately half an hour she was on her bed with the sheet and spread pulled up to her neck. She continuously asked Porter to leave. He said that first he had to calm down. She asked him several times to leave the bedroom so she could dress. He finally left the bedroom and stood outside the bedroom door with the door ajar five or six inches. Miss Logsdon dressed herself in jeans and a terrycloth top. She was not wearing shoes. She turned on the bedroom light and went into her living room. Porter sat on the living room couch approximately 12 to 15 feet from the bedroom door. Miss Logsdon walked to the opposite end of the couch, got her cigarettes and leaned against the stereo. The stereo is located directly across the room from the outside door to the apartment. Miss Logsdon kept asking Porter to leave. She said she was tired and had to work the next day. He said he would leave when he finished his cigarette. He repeated that he wanted to meet her. He then said he wanted a drink, and she said he would have to go elsewhere. He lit another cigarette and said he would leave when he finished it.

Miss Logsdon said that he noticed that her hands were shaking; that

he told her not to be afraid, and that he would not hurt her. He said he would leave if she gave him a glass of water. When she was in the kitchen to get the water, she found Porter standing at the door. He grabbed her by the arm, displayed a knife-like object, with a four-inch blade, and told her, "Now, get to the bedroom. You know why I am here." She asked Porter to leave but he responded he did not want to hurt her but he could if he had to. "It's something that I have to do, so quit stalling and let's get it over with," he said.

Miss Logsdon pleaded with Porter to discard the weapon. He said he would not have to use it if she did what he said. He took the girl to the sliding doors leading from the apartment to the balcony, pushed the doors open and laid the weapon outside on the balcony. She insisted that he throw the weapon over the balcony and said that, if he did, she would not scream. As she tried to pull away from him, he said, "I can choke you to death if I have to." He said that even though he had discarded the weapon, she still would have to do what he wanted. He emphasized his threat by saying, "You know what happened five years ago tonight? That was the night Richard Speck murdered the nurses in Chicago. I don't want that to happen to you. I don't want to hurt you, but I can."

Although Miss Logsdon kept begging Porter to leave her alone he ordered her to go to the bedroom. While holding her arm he said he was thirsty and pulled her into the kitchen. She tried to obtain a knife, but he knocked it from her hand, told her to quit stalling, and, while holding her by the arm and around the neck, pushed her into the bedroom. Miss Logsdon was crying. While he held her, Porter forcibly removed her pants and pushed her back onto the bed. He said he would hurt her if she screamed. She attempted to push him away with her free arm and continued to get him to leave her alone. He then used his knees to force apart her closed legs and had intercourse with her, with one arm across her throat. The struggle and the intercourse lasted approximately 15 minutes. Following the act of intercourse, Porter apologized but said it was something he had to do. He then said he was thirsty and obtained a coke in the kitchen and poured it into one glass for him and one for her. Still holding her by the arm, he took her back to the bedroom and said he would have to tie her arms and feet because he knew she would call the police. She asked him just to leave and said she would not report the incident to the police. The time was approximately 5:30 A.M. Porter then went into the bathroom. Miss Logsdon dressed herself in her jeans, without shoes or panties, unlocked the front door, and went to the car. She drove to the police station immediately. The police testified that she was crying and sobbing, barefoot, and with her hair in disarray when she came to the police station shortly after 6:00 A.M. saying that she had

been raped. The police took her to the hospital for examination and then returned with her to the police station to take her statement.

Defendant Lawrence H. Porter was not arrested as a suspect until he surrendered voluntarily to the police in the middle of August. He said he was surrendering because he was involved in the incident, and that a man who had been identified as the assailant by Miss Logsdon in a line-up on August 11, 1971, had nothing to do with it. Porter said his conscience bothered him. Porter furnished a statement of his version as to what had occurred. His statement was admitted into evidence at the trial. His testimony at the trial was to the same effect.

In Porter's testimony, he stated that he left a bar shortly after 2:00 A.M. on the morning in question and that while proceeding to his home he saw a girl arising from grass along the street shortly after an automobile had left the vicinity. He asked her if she was all right and if she wanted to go to a hospital. She was wearing a pinkish robe at the time. She asked him to walk her to her door and he agreed, but the door was locked. He suggested she ask the manager for a key but she said she had been locked out before and asked for a screwdriver. He went to his car, obtained a brass rod he used in his work and, at the insistence of the girl, put it in the lefthand corner of the bedroom window, flipped the screen off, opened the window, got in and opened the front door for her.

He stated he was going to leave but that she asked him to stay for 10 or 15 minutes. He said he could not stay because his wife was waiting. She asked that he stay just a few minutes, because she did not want "that kid" to come back. He agreed. As he sat on the couch, she sat on the stereo about 4 feet in front of him. He stated her legs were apart and her robe was half opened at the legs. He could see that she was not wearing panties. He became nervous, his mouth got dry and he asked for a glass of water. She offered him vodka, but he said he could not drink whiskey. She got him a glass of water and she again leaned against the stereo. She asked his name and he said it was Lawrence Porter.

Porter stated he was ready to leave when Miss Logsdon asked him to lend her $20. When he said he had no money, she sat down next to him, put her arm around him, and asked him if he would make love for $20. When he arose to leave, she stood and walked to the door ahead of him and asked if it would be worth $20 for her not to "holler rape." He then gave her the $20 and said, "Here, let's get it over with," and went into the bedroom. She lay on the bed and opened her robe. He undressed and got into bed with her where they had intercourse, he stated. When they finished she asked if he wanted to split a Pepsi. They sat on the bed and conversed. He then took his clothes into the bathroom and washed and dressed and when he emerged, no one was there.

Paul McDowell testified as a rebuttal witness for the State. He was a radio station announcer and lived at apartment 18 in the building in which the incident took place. Miss Logsdon lived in apartment 19. McDowell testified that he arrived home from work about 11:15 P.M. on the night in question and then listened alone to his stereo until about 3:00 A.M. Between 2:00 and 2:15 A.M. he heard a ripping sound at the sliding glass door of his apartment. He remembered the time because he had been timing a record. He went to the regular door next to the glass door and he saw Porter standing on the balcony between the two doors. Porter asked if a female lived in McDowell's apartment. McDowell said she did not. Porter walked away. McDowell then went outside and found that the screen on his apartment sliding glass door had been cut and pushed back. McDowell knew this condition had not existed prior to that time, because the screen had been locked. McDowell said he called his landlord but not the police.

With respect to the issues of fact (and the conflicting testimony), the jury, as finders of fact in criminal litigation, normally is entitled to believe or disbelieve such evidence as it wishes, so long as the evidence, as a matter of law, raises a reasonable inference of guilt. (*People v. Hoffman,* 45 Ill.2d 221, 258 N.E.2d 326.) When the criminal trial involves a crime of rape, we recognize that somewhat different rules apply to determine compliance with the standard of proof. Where the act of sexual intercourse is not questioned, the accused inherently is vulnerable to conviction on the basis of facts, known only to the complainant and the accused, which if accorded a slightly different interpretation, could establish either guilt or innocence. (*People v. Faulisi,* 25 Ill.2d 457, 185 N.E.2d 211.) By reason of this situation, the testimony of a prosecutrix is required to be "clear and convincing" or independently corroborated. (*People v. Scott,* 407 Ill. 301, 95 N.E.2d 315.) To establish the crime of rape, the intercourse must have been forcible and against the will of the victim although useless or foolhardy acts of resistance are not necessary. The evidence should demonstrate that the act was against her will. *People v. DeFrates,* 33 Ill.2d 190, 210 N.E.2d 467, 469.

While the complainant in the instant case did not scream, the jury could determine that she was frightened, particularly in view of the implied threats made by the defendant in the cause. There was evidence that the prosecuting witness attempted to obtain a knife but was prevented from doing so by defendant. Miss Logsdon was never concealed from Porter during the entire period even while she was dressing since her bedroom door was ajar. There was also substantial corroborative evidence in the record of Miss Logsdon's version through the police officer's description of Miss Logsdon's appearance and emotional state, and the

circumstance that there was immediate complaint. (*People v. Jackson*, 3 Ill.App.3d 303, 279 N.E.2d 8.) The evidence of forcible entry to her apartment, as shown by photographs, was also corroborative. The fact that no medical evidence was introduced was not a basis for reversal. Medical testimony is not indispensable to a rape conviction. *People v. Jackson*, 3 Ill.App.3d 303, 279 N.E.2d 8.

■■ The record also sufficiently shows evidence that defendant Porter was guilty of burglary, if the jury believed the testimony as presented. It is obvious that defendant entered the apartment without authority and that Porter's presence in the apartment was first detected when he was lying across Miss Logsdon as she was awakened at 4:00 o'clock in the morning.

■■■ Defendant argues that the trial court erred in allowing the prosecution to introduce new evidence in rebuttal when that evidence did not contradict or expand any testimony which had been presented previously and when the rebuttal witness had not been disclosed to the defense prior to the trial as a witness to be called by the State. We do not believe that this is a sound basis for reversal on the record. The State first learned of the existence of McDowell as a potential witness, after the trial had commenced. The prosecutor, outside the presence of the jury, advised the court he intended to call McDowell in rebuttal. The court ordered an overnight recess to allow defense counsel to interrogate McDowell. Defense counsel did in fact interview McDowell. Prior to testifying, McDowell was required to submit to a voir dire examination during which he explained he had no contact with the police or prosecutor's office until Tuesday of the week of the trial. Section 114—9 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, sec. 114—9), requiring the State, on motion of defendant, to provide to defendant a list of witnesses for the State, does not apply to rebuttal witnesses as specifically shown in section 114—9(c). Rule 412 of Illinois Supreme Court Rules (Ill. Rev. Stat. 1971, ch. 110A, § 412) implements section 114—9 referred to. The Committee Comments in the Illinois Revised Statutes Annotated as to Rule 412 indicate that Rule 412 is not intended to abrogate the exception set forth in Section 114—9(c). This exception is applicable even if the rebuttal witness in question might also have presented testimony which could have been used in the State's case in chief. (*People v. Howze*, 7 Ill.App.3d 60, 286 N.E.2d 507.) McDowell's testimony directly refuted Porter's testimony with respect to Porter's actions at approximately 2:00 A.M. on July 14. It was, therefore, properly admitted in rebuttal in the discretion of the trial court. The trial court extended to defense every reasonable safeguard which was available under the circumstances to preclude surprise.

■■ It is also contended that McDowell's testimony was grossly prejudicial for the reason that it referred to Porter's commission of a crime other than those for which he was being tried. While it is true that evidence of the commission of an offense which is not the crime for which defendant is being tried might become inflammatory and prejudicial and that a vigorous effort should generally be made to avoid the prejudicial effect of such evidence, evidence of such activities, however, is not inadmissible under all circumstances. At least one exception which has been established by the Supreme Court of this State from the general rule is applicable in the cause before us. Evidence which is relevant for purposes other than to show defendant's propensity to commit crimes is admissible even though it necessarily includes evidence of defendant's commission of another crime. (*People v. Cole*, 29 Ill.2d 501, 194 N.E.2d 269; *People v. Armstrong*, 41 Ill.2d 390, 243 N.E.2d 825.) McDowell's testimony tended to contradict Porter's assertions as to how, in the early morning of July 14, Porter gained access to complainant's apartment. It also tended to show that Porter was looking for a woman and was trying to gain entrance to her apartment by forcible means without authority. It likewise tended to show that Porter had the knowledge and the tendency to gain access to complainant's apartment in precisely the manner in which complainant testified he did. Since Porter himself had testified in his defense telling a different story, the State's use of McDowell in the rebuttal portion of the case was not only proper but it became essential to the State's case. (See: *People v. Tranowski*, 20 Ill.2d 11, 169 N.E.2d 347; *People v. Brown*, 26 Ill.2d 308, 286 N.E.2d 321.) No reasonable means existed for McDowell to delete all reference as to how he happened to encounter Porter and still have his testimony serve the function of refuting Porter's contentions and corroborate the testimony of complainant. When the need for relevancy and materiality of McDowell's testimony is weighed against the potential of such testimony for arousing the jury we must conclude that the trial court exercised proper discretion in admitting such evidence.

The jury received separate jury forms at the close of the trial, each without objection from defense counsel and with defense counsel having tendered no requested alternates. The four forms were "not guilty", "guilty of rape and burglary", "guilty of rape", and "guilty of burglary". Defendant now asserts that the failure of the court, *sua sponte*, if necessary, to give separate not guilty forms for each crime, denied defendant a fair trial and due process. Defendant contends that the forms inherently made it difficult for the jury to return a verdict of guilty of one of the two crimes charged and not guilty of the other. This court recently considered this issue in *People v. Lilly*, 9 Ill.App.3d 46, 291

N.E.2d 207. In that case, defendant was tried for rape and indecent liberties. The jury received three verdict forms, "guilty of rape", "guilty of indecent liberties", and "not guilty". Defendant in *Lilly* contended that it was the duty of the court to give a not guilty form of verdict for each charged crime. We disposed of the contention there by quoting the Illinois Supreme Court in *People v. Springs*, 51 Ill.2d 418, 283 N.E.2d 225, 229:

> "We have repeatedly announced the rule that the court is under no duty to give instructions not requested by counsel."

A remaining issue is whether, as a matter of law, Porter could be sentenced for both burglary and rape. When plural crimes do not arise from the same "conduct", a court may impose a separate consecutive or concurrent sentence for each crime. (Ill. Rev. Stat. 1971, ch. 38, § 1—7(m); retained in Unified Code of Corrections. Ill. Rev. Stat., 1972 Supp., ch. 38, § 1005—8—4.) In the Committee Comments to section 1—7(m) of the Criminal Code of 1961 (S.H.A. ch. 38, § 1—7(m)), as noted in *People v. Stewart*, 45 Ill.2d 310, 359 N.E.2d 24, 25, 26; and *People v. Ritchie*, 66 Ill.App.2d 302, 213 N.E.2d 651, 657, aff'd, 36 Ill.2d 392: "* * * if the offenses resulted from the same conduct the defendant may not be sentenced on [each]." It is, therefore, argued by defendant Porter, that if the burglary conviction, considered by itself, can be sustained as a matter of law, then he must have been regarded as having entered the apartment with the intent to commit rape. He also argues that if the rape conviction considered by itself is to be sustained, he must have been regarded as having committed that offense. He, therefore, concludes that the two crimes necessarily had to relate to the same "conduct" within the meaning of section 1—7(m) referred to.

■■ Even if we were to assume that Porter entered the apartment with the intention of committing rape and that without ever changing that intention he moved directly to the consummation of his objective, the recent Illinois Supreme Court case of *People v. Moore*, 51 Ill.2d 79, 281 N.E.2d 294, controls our disposition of this issue. In that case defendant *Moore* entered his victim's room without authority. Promptly, without deviation from his obvious purpose, he raped the victim and committed deviate sexual assault and robbery. The trial court sentenced him to concurrent sentences on each crime. In affirming the trial court and disposing of the issue that is now before us, the Illinois Supreme Court stated:

> "Each of the offenses of rape, robbery and burglary, although committed in the course of the same transaction, involves conduct clearly divisible from the conduct which constitutes the other offenses." 51 Ill.2d 79, 87-88.

The test, therefore, to be applied then is not whether the conduct was a product of a singleminded purpose or single motive, or "the same transaction" but rather whether we are considering "separate offenses", none of which is included as a lesser offense within a greater offense. According to the *Moore* case, this involves separate "conduct." Because the offense of burglary is separable from the offense of rape, on the basis of the separate conduct required to establish each of them, defendant was properly sentenced for both burglary and rape.

■■ The final issue which we can consider is the propriety of the sentences. We agree that the defendant is correct in asserting that Illinois Unified Code of Corrections, even though not in effect at the time of sentencing of defendant, is nevertheless applicable to cases on appeal where final disposition has not yet been rendered on appeal. (*People v. Chupich,* 53 Ill.2d 572; Ill. Unified Code of Corrections, sec. 8—2—4; Ill. Rev. Stat., 1972 Supp., ch. 38, sec. 1008—2—4.) Under the Illinois Unified Code of Corrections, burglary is a so-called "Class 2" felony punishable by imprisonment for not less than one nor more than 20 years (Ill. Rev. Stat., 1972 Supp., ch. 38, sec. 1005—8—1(c)(3)). Under prior law (Ill. Rev. Stat. 1971, ch. 38 § 19—1) the punishment was imprisonment for one to an indeterminate number of years. The new Code limits the minimum sentence to not more than ⅓ of the maximum. Since the maximum sentence imposed is 10 years, we should reduce the minimum sentence in the instant case for the burglary offense to 3 years and 4 months.

■■ With respect to the minimum sentence of 5 years on the rape conviction, we note from the record that defendant had not been convicted previously of any crime and that he had voluntarily surrendered himself to the police. Due to the illness of the trial judge, another judge, who had not become familiar at the trial with the facts of the case through personal observation of witnesses, actually sentenced the defendant. We note that under the new Illinois Unified Code of Corrections (Ill. Rev. Stat. 1971, ch. 38, § 1005—8—1(c)(2)), the minimum term for rape as a "Class 1" felony is required to be set at 4 years, "unless the court having regard to the nature and circumstances of the offense and the history and character of defendant, sets a higher minimum term." Because of the circumstance that the sentencing judge presumably had no greater familiarity with the case than do we on appeal, we believe that the new Code in this instance contains statutory advice with respect to the minimum sentence for rape which should be applied in the instant case upon the basis of the record, in view of the fact that defendant had no prior conviction and voluntarily came to the police to disclose his involvement, presumably to avoid a miscarriage of justice. The minimum

sentence, therefore, for the crime of rape will be reduced to a term of 4 years with the maximum sentence remaining at 10 years.

The judgments of conviction, therefore, will be affirmed but the sentences are modified to provide that the sentences shall be served concurrently, with the burglary sentence to be not less than 3 years and 4 months nor more than 10 years and the rape sentence to be not less than 4 years nor more than 10 years.

Sentences modified and judgments affirmed.

DIXON and SCOTT, JJ., concur.