THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALBERT CARROLL *et al.*, Defendants-Appellants.

First District (1st Division)  No. 76-55

Opinion filed May 24, 1977.

Coghlan and Joyce, of Chicago (William J. Nellis and Randall Spencer, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Albert Carroll and Albert Merino (defendants) were found guilty of rape (Ill. Rev. Stat. 1969, ch. 38, par. 11—1(a)), deviate sexual assault (par. 11—3), and aggravated kidnapping (par. 10—2). They were each sentenced to 15 to 30 years on each of these charges, to run concurrently. They appeal.

Defendants contend that the State failed to prove beyond a reasonable doubt that the acts were accomplished by force or threats of force; the State commented upon the failure of defendants to testify; defendants should not have been convicted of both rape and aggravated kidnapping; defendants were penalized for exercising their right to jury trial and their sentences should be reduced.

The complaining witness, a student at a junior college, was born in Poland. At the time of the occurrence she had been in this country for approximately 8 years. About 9 p.m. on September 23, 1971, she was walking home alone from a dancing school. An automobile stopped near her path. Carroll was driving. Merino was a passenger. There were two other male passengers. She testified that one of the men offered her a ride and she declined. One of the passengers, Michael Briseno, left the automobile and started to walk next to her. In response to his questions she told him her name, that she came from Poland and that she was going to school. He told her that his name was "John." He asked if she would like to go out over the weekend but she stated that she worked at her mother's tavern. She told him approximately where the tavern was.

Briseno then left her and went back to the car. She continued walking for about two blocks. The car followed. Then all four of the men left the car. Another passenger, Frank Matous, "grabbed" her and pulled her to a gangway between two buildings. She tried to pull away but tripped. Briseno came up and pulled her from her other side. She did not scream. Matous had his hand over her mouth. Briseno told her that if she kept still she would not get hurt. All of them walked to the automobile. She did not scream and no one struck her before or after getting into the car. Matous pushed her and told her to get in, which she did. He sat on her right side

with Briseno at her left. Carroll drove and Merino sat beside him. She asked where she was being taken. She was told, "Don't worry; you will be all right." As the car was moving, Matous started making advances toward her and pulled her to him. She stated that, "There was a struggle." She tried to move away from Matous but he pulled her back. As the car proceeded, she was blindfolded by one of the men.

The car stopped at what seemed like a gas station. She saw a liquor store across the street. Briseno, Carroll and Merino got out of the car. She did not scream, attempt to get out of the car or try to attract the attention of anyone. The car windows were all closed. The three men returned with paper bags containing bottles of wine. They drank and offered her some but she refused. The car continued on and finally stopped. Defendants took a blanket out of the trunk. Three of them got out and left her with Matous. Briseno said the place would not do and they all got into the car and drove off again. During this time no one exhibited a weapon to her. She was then blindfolded again. In due course, the car stopped before a garage. The doors were opened and the car entered. Matous pulled her out of the car by her hand. Briseno and Carroll put a mattress on the floor and took out the same blanket. Briseno told her to undress. She refused and moved away. Briseno said, "Well, you have no choice." He and Matous started to pull off her sweater. She said, "All right. Just leave me alone" and then took her clothes off.

She testified that she was first raped by Matous. She asked him to help her escape but he said there was nothing he could do. She testified that after a struggle he had intercourse with her and he forced her to perform a deviate sexual act. Matous left and Briseno came over. She testified that he pulled and pushed her and was rough. She tried to resist but did not strike any of the men. She cried for most of the time and screamed when Briseno was rough with her. She was also told that she would not get hurt if she behaved. All of the four men, including defendants, had intercourse with her in turn and forced her to perform deviate sexual acts. Matous, Briseno and Carroll all repeated each of these acts. She then got up and dressed. She was again blindfolded and entered the car. They drove for about 45 minutes. She was able to remove the blindfold and noted where the car was going. She asked them to let her out. Briseno told her that she was not to call the police because the group knew all about her and had her "I.D.'s." She had been carrying a large bag with her identification and money. The car stopped in an alley and she left. She ran into a yard and hid there for 10 minutes, "hoping that they go away."

She walked to a nearby tavern some 2 blocks from her residence. She sat in a corner there and cried for about 10 minutes. A bartender spoke to her but she did not tell him she had been raped. She then ran to her apartment. She had lived there for a year. She did not know any of the

neighbors. She washed, douched, set her alarm and went to bed. She had no bruises, marks or scratches on her body. Next morning she felt weak but she went to school. She had a brief conversation with one of her teachers. This teacher, an associate professor of psychology at Wright Junior College, testified that he first saw her early in the afternoon. She was at her locker, teary faced and sobbing. He took her to his office where they spoke for a few minutes. She spoke softly and hesitantly while she sobbed. He then took her to the counselling department. He participated in the conversation there for a few minutes and left.

The complaining witness further testified that she made an appointment to see a doctor. He gave her some pills to calm her. She then called the police at about 5 p.m. and went to police headquarters. An artist drew sketches of all four men as she described them. On October 20, almost 1 month after the incident, she identified Matous and Briseno in a lineup and then went with an officer to the garage.

A police officer testified that on October 19, 1971, he stopped close to a vehicle with three male occupants. One of them, seated closest to the officer, fit the description in one of the sketches. It developed that two occupants of the car were Briseno and Matous. The automobile, driven by defendant Carroll at the time of the alleged crime, subsequently identified from a photograph by the complaining witness, was found by the police at Carroll's residence. Another police officer testified that a search of the interior of the car disclosed a burlap-type blanket. Another officer obtained a key to the garage in question from Briseno and found that this key opened the small access door in the larger garage door. No further evidence was heard at trial.

■■ The initial argument raised by defendants is directed at the issue of whether the acts in question were accomplished by force or threats of imminent force. To substantiate a charge of forcible rape, the law requires the State to prove beyond a reasonable doubt that the act was committed by force and against the will of the victim. (See Ill. Rev. Stat. 1975, ch. 38, par. 11—1(a).) Defendants urge that no weapon was used against the complaining witness; there is no evidence that any one of the four participants struck her or even exhibited a weapon; there is no evidence that the complaining witness ever attempted to escape from the automobile or that she ever screamed to attract attention from other motorists or pedestrians and it is undenied that the complaining witness had no bruises or injury.

■■ As against these matters, however, it must be remembered that the complaining witness was confronted by four mature young men. She was first seized and pulled into the gangway. She was then pulled into the automobile and shortly thereafter she was blindfolded. She was told that if she kept still she would not get hurt. At several points the complainant

struggled but, fortunately for her physical safety, she did not at any time attempt a physical encounter with the four men. The fact that they drank wine in her presence would serve as an additional deterrent to such conduct by her. The very fact that defendants blindfolded her after performance of the acts is a cogent demonstration of the lack of consent.

The cases teach us that it is not possible to formulate a definite standard for determining the amount of resistance required to evidence lack of consent. "Such a determination must be made from the facts and circumstances of each case." (*People v. Montgomery* (1974), 19 Ill. App. 3d 206, 210, 311 N.E.2d 361.) Each case, therefore, must be judged upon the evidence presented. The real issue is "the futility of the complainant's resistance under the circumstances." *People v. Murphy* (1970), 124 Ill. App. 2d 71, 75, 260 N.E.2d 386, citing *People v. Smith* (1965), 32 Ill. 2d 88, 92, 203 N.E.2d 879.

The physical abduction of this one girl by four men is an important factor. It has been held that, "In weighing the evidence of force, it is proper to consider the disparity in size and strength of the parties and the place and conditions under which the act took place." *People v. Browder* (1974), 21 Ill. App. 3d 223, 228, 315 N.E.2d 168, citing *People v. Sims* (1972), 5 Ill. App. 3d 727, 729, 283 N.E.2d 906.

A case rather similar to the one at bar, involving a rape by a number of men acting in concert, is *People v. Trejo* (1976), 40 Ill. App. 3d 503, 352 N.E.2d 68. The complaining witness there testified that she kicked one of the men and pushed him back. She stated that she tried to scream but "it wouldn't come out." There was no evidence of bleeding or bruises about her person. Defendants there raised the same issue concerning alleged want of resistance. The court there pointed out that, "Any further resistance on the part of the prosecutrix to the advances of the four defendants, who had been drinking, could well have been not only futile but dangerous." 40 Ill. App. 3d 503, 509.

In *People v. Hendon* (1975), 33 Ill. App. 3d 745, 338 N.E.2d 472, *appeal denied* (1976), 62 Ill. 2d 590, this court was presented with a factual situation analogous to that in the instant case. The victim there was accosted by defendant as she approached a phone booth to make a call. She told him that she would call the police and ran into the booth. She apparently decided that she could escape and left the booth without calling the police. Defendant thereupon grabbed her, told her to "shut up or else" and forced her into a car. He drove her to a house and dragged her into the cellar. She removed her clothes at his demand. Defendant then had intercourse with her and forced her to perform deviate sexual acts. His brother then entered the room and also had intercourse with her. There was no mention of a weapon in the testimony. She testified that defendant told her to shut up "in a loud and vicious way" and stated that

she did as she was told because she was in shock and was afraid of losing her life. *Hendon,* 33 Ill. App. 3d 745, 747.

This court stated the principle that "[r]esistance is not necessary under circumstances where resistance would be futile or would endanger the life of the female, nor where she is overcome by superior strength or paralyzed by fear." (*Hendon,* 33 Ill. App. 3d 745, 749.) This same principle is operative to an even greater degree in the case before us where one young girl is seized by four able-bodied men, hustled into their automobile, blindfolded and then brutally subjected to the degrading experience of performance of sexual and deviate acts by each of these men. It would be inconceivable to require actual physical resistance by her, at the imminent risk of injury or even death, as a condition precedent to concluding beyond reasonable doubt that her assailants were guilty of forcible rape.

■■ ■ In our opinion, the argument of defendants that the complaining witness failed to make a prompt complaint to the authorities is similarly lacking in merit. The last words spoken by defendants to the complainant were a warning not to inform the police. As may well be imagined, at the conclusion of the episode, the complaining witness was shaken and upset. When she stopped at the tavern she remained for a time and cried. The next day in school she was still shaken to such an extent that a teacher helped her obtain medical attention and psychological assistance. The doctor gave her a medication of some type for the purpose of calming her down. She called the police at about 5 p.m. the next day and then went to police headquarters. In *Trejo,* the complainant failed to file a formal complaint until 50 days after the rape. The court pointed out that this delay "was but a factor for the jury to consider in weighing the testimony of the prosecutrix." 40 Ill. App. 3d 503, 509.

Defendants point to various discrepancies in the testimony of the complaining witness as compared to her previous testimony at the preliminary hearing. For example, at trial the witness testified that when pulled into the gangway by her assailants, she did not scream. She testified that defendant Matous had his hand over her mouth. At the preliminary hearing she testified that she did not remember whether anyone had his hand on her mouth. The incident occurred on September 23, 1971. The preliminary hearing was held 3 months later on December 23, 1971. The trial was held in June 1975. The complaining witness had been in this country some 8 years at the time of the occurrence.

■■ These factors operating together could be, at least in part, responsible for the alleged discrepancies and variations between the testimony thus given by the complaining witness. In any event, discrepancies of this type and nature serve simply to raise an issue of credibility for decision by the trier of fact. (*People v. Simental* (1973), 11

Ill. App. 3d 537, 541, 297 N.E.2d 356.) The jury as trier of the fact saw and heard the witness and heard oral argument by able counsel for both sides regarding the strength of her testimony with due reference to all of these points. The special duty imposed upon reviewing courts of careful examination of the evidence in rape cases has been reiterated many times. However, the discharge of this duty does not require us to substitute our judgment for that of the trier of fact. In *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288, the court affirmed a finding of guilty reached after a bench trial. The language of the supreme court is equally pertinent to the result reached by the jury in the case before us (54 Ill. 2d 51, 57-58):

> "Courts of review have a special duty of carefully examining the evidence in rape cases. (*People v. Qualls,* 21 Ill. 2d 252.) But in doing so the court may not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence which was presented. (*People v. Springs,* 51 Ill. 2d 418.) That evidence has been conflicting will not justify a reversal of a finding by the trier of fact. (*People v. Springs,* 51 Ill. 2d 418; *People v. Hiller,* 7 Ill. 2d 465.) A court of review will not set aside a finding of guilty unless the evidence is so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused. *People v. Sumner,* 43 Ill. 2d 228."

Regarding allegedly prejudicial closing argument, defendants depend upon a remark by the State that the complaining witness had been blindfolded part of the time. The prosecutor then stated, "They have to have an explanation; why is it that she was blindfolded? I have no explanation with that." The attorney then stated that this fact was inconsistent with a theory of consent by the complaining witness and pointed out that she "told her explanation." No objection was made to these remarks. Defendants made a motion for mistrial after completion of closing argument. The motion was denied.

In addition, at one point an assistant State's Attorney noted that in the opening argument his colleague had "asked to have the lawyers explain to you the blindfold. Did you ever hear a single explanation?" At this point, defense counsel objected and remarked that he was not bound by the request of the assistant State's Attorney. The court sustained this objection.

■■■ Defendants urge that these remarks constitute reversible error because they were comments on the failure of defendants to testify. We disagree. The first of these comments was made without objection. It is the general rule in Illinois that failure of defendant to object to improper final argument waives the point. (*People v. Dailey* (1972), 51 Ill. 2d 239, 243, 282 N.E.2d 129.) In addition, examination of the record convinces

that the requests for explanation were not directed at the defendants or at their failure to testify, but were directed at the attorneys. Even if it be construed that these remarks were directed to the fact that defendants failed to offer any contradiction of the testimony of the complaining witness, prejudicial error would not result. In *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 7, 284 N.E.2d 283, the prosecutor told the jury seven times that the testimony of the prosecuting witness was uncontradicted. The supreme court held that these references were proper in a situation where the testimony was, in fact, uncontradicted. The court differentiated *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490, which defendants cite in the case before us, by pointing out that in *Wollenberg* there was testimony by two defense witnesses but the prosecutor commented on the fact that no one else had testified.

■■ Since the trial judge has a superior opportunity to determine the propriety of the argument, these issues are generally left to the trial court absent a clear abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) Also upon the entire record, we cannot say that this argument constituted "a material factor in the conviction, * * * " (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363), or resulted in "substantial prejudice to the accused." *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.

The final contention of defendants is directed at the sentences from a number of points of view. They first insist that there is a duplication in the convictions for rape and aggravated kidnapping. The indictment alleged that defendants committed aggravated kidnapping by virtue of the rape. Defendants urge that the frequently cited case of *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819, supports their point of view. In *Williams*, the court held that unauthorized entry with intent to commit theft and then an armed robbery both arose from the same conduct.

■■ This problem has been solved by the recent decision in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. In our opinion, this case has opened a path to consistency regarding convictions and concurrent sentences for more than one offense. In *King*, the supreme court held "that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551.) Thus, the so-called independent motivation test has been eliminated. Translating this holding to the case before us, it follows that the offenses of rape and aggravated kidnapping arose from a series of incidental or closely related acts and are not lesser included offenses. Consequently, the convictions for aggravated kidnapping and rape were properly entered and they are affirmed.

Defendants next urge that they were penalized because they elected to go to trial while their codefendants, Briseno and Matous who pleaded guilty, were given lighter sentences. The record before us shows that Matous was sentenced to concurrent terms of 4 to 14 years for deviate sexual assault and 5 to 15 years on each for rape and aggravated kidnapping. Briseno was similarly sentenced to 7 to 14 years and 7 to 20 years. In this regard, on June 10, 1976, we granted leave to defendants to file a supplement to the record consisting of certified copies of indictments and pages from reports of proceedings in other cases in the circuit court wherein Matous and Briseno were defendants. On November 23, 1976, the State made a motion to strike this supplemental record supported by an affidavit of counsel which set forth that none of these documents were made part of the record before the trial judge and that the additional material is not only improper but is irrelevant. The affidavit states that the People did not have access to the record when the supplemental material was filed. Defendants have objected to the motion to strike the supplemental record. This court took the motion to strike and the objections with the case. Both parties commented on this issue during oral argument.

The defendants depend upon Supreme Court Rule 329 (Ill. Rev. Stat. 1975, ch. 110A, par. 329), which provides that additional portions of the record may be supplied where "the record is insufficient to present fully and fairly the questions involved, * * *." In our opinion, this rule applies to supplementation of the record before this court with additional portions of the record which were before the trial court. To hold otherwise would transmute the rule into an authorization for trial de novo in the reviewing court. If we were to consider this supplemental record, every defendant urging disparity in sentence might then attempt to bring before us any number of unrelated records involving sentences of other persons for the same offense. The supplemental record is therefore stricken.

■■ On the merits of the contention, we find nothing in this record to demonstrate that these defendants received a heavier sentence because they demanded trial by jury. In *People v. Young* (1974), 20 Ill. App. 3d 891, 314 N.E.2d 280, this court reduced the sentence because the record indicated otherwise. The court cited *People v. Perry* (1971), 47 Ill. 2d 402, 266 N.E.2d 330, to the effect that the record must clearly establish that the heavier sentence resulted from defendant's trial. The mere fact that the two defendants before us received a higher sentence than their co-defendants who had pleaded guilty does not itself "warrant an inference that the higher sentence was imposed as punishment for having insisted on the right to stand trial." (*People v. Houston* (1974), 21 Ill. App. 3d 209, 216, 315 N.E.2d 192, *cert. denied* (1975), 420 U.S. 936, 43 L. Ed. 2d 412, 95

S. Ct. 1145.) On the contrary, our review of the record before us convinces that in passing sentence the careful and learned trial court was motivated solely by a laudable desire to make the punishment imposed suitable to the crime committed.

We note also the decision of the supreme court in *People v. Sivels* (1975), 60 Ill. 2d 102, 324 N.E.2d 422, which quotes from the American Bar Association Project on Minimum Standards for Criminal Justice which in turn points out that, although a defendant cannot be penalized for having chosen to go to trial, "dispositional concessions may be made by a court to a defendant who pleads guilty * * *." 60 Ill. 2d 102, 104.

We have given grave consideration to the last argument by defendants which attacks their sentences as excessive. We have had occasion to consider and to review the many decisions relating to the power of this court to reduce sentences. (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4).) We have often cited cases such as *People v. Sprinkle* (1974), 56 Ill. 2d 257, 264, 307 N.E.2d 161, *cert. denied* (1974), 417 U.S. 935, 41 L. Ed. 2d 239, 94 S. Ct. 2650, which point out that a sentence should be disturbed only if it is "greatly at variance with the purpose and spirit of the law * * * " or manifestly in excess of constitutional provisions. These cases also stress that the trial court is generally in a better position than the reviewing court to make a sound determination of the proper sentence.

■■ We are fully aware of the serious nature of the reprehensible crimes here involved and of the devastating effect upon the victim. However, our duty is not to take vengeance but to arrive at a sentence which will be fitting and reasonable under all of the applicable circumstances. As above pointed out, without conceding that the disparity between the sentences regarding the two defendants who pleaded guilty requires reduction of the sentences, we cannot help but feel that "more evenhanded justice * * * " (see *People v. Gregory* (1976), 43 Ill. App. 3d 1052, 1058, 357 N.E.2d 1251), requires a reduction of the sentences here. Furthermore, the defendant Merino has a record of one misdemeanor conviction resulting in a fine. In our opinion his sentence should not be the same as that given to defendant Carroll and both sentences should be reduced.

Accordingly, the sentences of defendant Albert Carroll for aggravated kidnapping, rape and deviate sexual assault are each reduced to 10 to 20 years to run concurrently. The sentences to defendant Albert Merino for these same crimes are reduced to 8 to 16 years to run concurrently. As thus modified, the judgments appealed from are affirmed.

Judgments modified in part and affirmed.

O'CONNOR and BUA, JJ., concur.