THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEROME GENUS, Defendant-Appellant.

First District (5th Division)   No. 78-624

Opinion filed August 3, 1979.

James J. Doherty, Public Defender, of Chicago (James L. Rhodes, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Pamela E. Loza, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was found guilty of rape and robbery and sentenced to four to six years imprisonment. On appeal, he presents the following issues: (1) whether the burden of proof was improperly placed upon him at the suppression hearing; (2) whether he was proved guilty of rape beyond a reasonable doubt; and (3) whether his out-of-court statements should have been suppressed because (a) he was not adequately informed of his right against self-incrimination which precluded a knowing and intelligent waiver thereof, (b) his written statement was tainted by the unlawful procurement of an earlier statement, and (c) his statements were the poisonous fruit of an illegal arrest.

It appears that on the evening of September 22, complainant left work at Evanston Hospital where she was employed as a practical nurse and arrived at her high-rise apartment building shortly after midnight. She and a neighbor entered one of the building's two elevators and rode to the seventh floor, where the neighbor disembarked. Complainant continued upward in the elevator until it suddenly stopped at the 13th floor. As she was attempting unsuccessfully to open the elevator door, a voice coming from the top of the car instructed her to stand still and remain quiet or "they would blow my [obscenity] brains out."

As ordered by the voice, she emptied the pockets of her uniform (a two-piece pantsuit), her jacket, and her purse (which included a driver's license, cigarette lighter, identification cards, and a $10 bill). She was then told to disrobe, to tie her blouse around her eyes, to unscrew the single light bulb which had illuminated the car, and to stand facing the corner of the elevator. After she had complied with these instructions, the door opened and a young male entered the car. He told her to lie on the floor and then inserted his penis into her vagina and had intercourse with her for approximately three minutes. A second male then entered the car and had intercourse with her for about four minutes. After whistling was heard emanating from the hallway, both males left the car as if they were responding to a signal. She then heard a voice shout, "Lady. I will help. Are you going to call the police?" When she replied that she would not do so, the voice stated that if she pulled a panel back she would find a button which would open the elevator door. After opening the door, she dressed and retrieved the contents of her purse, but the lighter and $10 bill were missing. Thereafter, she ascended to her 15th floor apartment, where she told her daughter that she had been raped and the police were then called.

On the evening of September 23, Officer Carl Reid and his partner were cruising in the neighborhood wherein complainant resided, looking for leads concerning a series of rapes occurring over a period of several months. In the driveway of a fast food restaurant they encountered two young men who identified themselves as Robert McCoy and Rodney Rhone. The two men accepted an offer to be driven home and, as the police car stopped near their residence, they observed two other men approaching. The officers alighted the vehicle and engaged these men in conversation. When the officers returned, Robert said that "[w]e didn't commit any rapes." Reid then inquired as to what prompted this announcement, in light of the fact that the officers had not mentioned the term "rape" during their prior conversation. Robert responded, "Well, we know about the rapes, everybody over here knows about the rapes." When asked what, if anything, he knew, Robert at first encouraged Rodney to speak to the officers but then admitted that his brother,

Michael McCoy, was one of the participants. Robert and Rodney were then taken to the station house and, upon further questioning, they implicated Reggie Smith and defendant.

Reid and his partner, who were in plain clothes, proceeded to the apartment building located across the street from that of complainant—where Michael McCoy, Reggie Smith and defendant resided. The officers first visited the Smith apartment where they knocked and, when a woman's voice from within inquired as to their identity, they announced their office. The woman then telephoned the Chicago Police Department for verification and, shortly thereafter, two uniformed officers arrived. Upon seeing them, Mrs. Smith opened the door and admitted all four officers. Reid informed her that they were there to take her son to the station for further investigation. Reggie then went with the officers to the McCoy apartment, where much the same procedure was employed as to Michael. The group then went to defendant's apartment where Reid knocked on the door, announced his office, and was admitted by defendant's mother. Reid told her he had received information from other participants that her son had committed several rapes. Defendant was then arrested and, while being transported to the station, Officer Reid informed him of his right against self-incrimination by a recitation of the *Miranda* warnings. After each aspect of such warnings was given, defendant stated that he understood.

Prior to trial, defendant moved to suppress statements made to police after his arrest. In three separate motions, he alleged that his arrest was illegal and that he did not voluntarily or intelligently waive his right against self-incrimination. After an argument between defense counsel and the prosecutor concerning the proper titling of a motion which seeks to suppress evidence on grounds that such was the fruit of an unlawful arrest, the following colloquy occurred:

"PROSECUTOR: I have had a conversation with counsel. I understand the basis is what the defense alleges was an illegal arrest, that there is no outright allegation of police brutality but rather the totality of circumstances originating with the illegal arrest. They don't claim the Miranda was not given.

DEFENSE COUNSEL: That's right.

PROSECUTOR: I have advised counsel available to testify are four officers, and he has indicated that those certainly from his view should be adequate to cover all bases to apprise this Court of the nature of the arrest. Is that correct?

DEFENSE COUNSEL: Right.

THE COURT: And the motion to quash [the arrest]?

PROSECUTOR: Would counsel be kind enough to give us copies of those during the lunch hour?

DEFENSE COUNSEL: Sure. May we proceed?

THE COURT: Yes.

DEFENSE COUNSEL: The first witness we would call to the stand is Mrs. Mary Griffin [defendant's mother]."

Mrs. Griffin testified that as she was in bed on the evening of September 23, two of her son's football teammates knocked on her front door and asked her son to come out. She heard her daughter tell Reggie Smith and Michael McCoy that her brother was asleep and would not come out. After they continued to knock for about 45 minutes, she opened the door to speak to the boys and about 10 Chicago police officers burst into the apartment with guns drawn. They announced that they were there to take defendant in for questioning about rapes and robberies occurring in the elevators of the building across the street. They waited for defendant to change from his pajamas into street clothes before escorting him from the apartment, and they refused to allow her to accompany defendant in the police car.

The defense then called Officer John Ferguson, who testified that when he first saw defendant in an interrogation room at approximately 3 p.m. on September 24, he introduced himself and gave defendant the *Miranda* warnings. Defendant said he understood them and was willing to discuss the matter. Officer Ferguson then gave defendant a pencil and paper so that he could, if he chose to do so, record any details he wished to remember. Defendant was then left alone for a period of time, during which he wrote certain details of the rapes and robberies on the paper given him. Later, a written statement was taken wherein Ferguson's questions and defendant's answers were typed by Officer Moore. After reading its contents, defendant signed the statement in which, among other things, he stated that he had been treated well by the police and had been given access to food, drink and toilet facilities.

After the defense rested, the State called only Officer Reid, who testified to the circumstances leading up to and surrounding defendant's arrest as set forth above.

In support of his motions, defense counsel, contending that the police should have obtained a warrant, argued that "the interrogation in the middle of the night of a ninth grader, alone in a police station, where his mother is not allowed to come along, with police officers—who knows how many are interrogating him—the whole situation is oppressive." Based upon the evidence given by Officers Reid and Ferguson, the trial court found that the arrest was based on probable cause and that the statements were admissible.

At trial, complainant testified as set out above and, in addition, stated that she did not consent to either act of intercourse and that she was unable to identify defendant as one of her assailants. The State then

called Officer Ferguson, who after testifying to certain foundational matters, read defendant's pretrial statement which in substance was as follows: That on September 22 between 10 p.m. and midnight Rodney Rhone, Robert McCoy and he were riding on top of the elevators in the building across the street from where they lived; that each elevator was controlled by two switches on the top of the car—one of which stops the elevator and the other opens and closes the door; that shortly after midnight a woman wearing a white nurse's uniform and carrying a purse and jacket entered the elevator; that Robert stopped the car on the 13th floor and asked her whether she had any money; that when she denied having any, Robert directed her to open her purse in which he (defendant) saw a wallet and a cigarette lighter but could not see whether there was any money in the wallet; that Robert ordered her to disrobe— which she did—and Robert then asked whether he could engage in sexual intercourse with her; that she replied, "Yeah. You don't have to rape me; I'll give it to you"; that Robert then got off the elevator, climbed to the floor above, walked down to the elevator door on the 13th floor, and was admitted into the car by defendant who was working the controls from the top of the car; that Robert searched through the contents of her purse, from which he took her lighter and, when she again said she was willing to allow intercourse, Robert unscrewed the light bulb and remained there in silence; that after a period of time, defendant returned to the top of the car; that Rodney and defendant then went down to the 13th floor and were admitted to the car by Robert; and that he (defendant) remained in the corner while Rodney engaged in sexual intercourse with the woman— following which the three youths left the building.

After the State finished its case, the defense rested without calling any witnesses.

OPINION

Defendant first contends that the trial court committed reversible error by placing the burden upon him of going forward with the evidence at the suppression hearing. He argues that by making him proceed first, a "strong presumption" was raised that the trial court was confused as to the State's burden and "impermissibly shifted the burden of proof as to the voluntariness of the statements." We disagree.

■■ Where an accused seeks to suppress an out-of-court statement on the ground that it was an inadmissible fruit of a warrantless arrest, he bears the burden of proving that it was not given incident to a lawful arrest; however, if defendant seeks to suppress such a statement as involuntarily given, it is the State's burden to show the voluntariness of the statement. (*People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752.) Concerning the discharge of the State's burden, it has been noted that:

"[T]he burden of going forward with evidence and of proving voluntariness is on the State, but the duel [*sic*] burdens do not have to be met simultaneously. [Citation.] Where the State makes *prima facie* showing that a confession was voluntary, the burden of producing evidence to show that the confession was involuntary shifts to the defense and shifts back to the State only when defendant has produced evidence. [Citations.] *People v. West* (1975), 25 Ill. App. 3d 827, 829, 322 N.E.2d 587, 588-89.

Here, the trial court did not order the defense to proceed first. Rather, the record discloses that defense counsel requested the opportunity to call the first witness. Defendant's position in the trial court, as evidenced by the allegations of his several motions to suppress and his arguments at the close of all evidence in the suppression hearing, was that upon consideration of the totality of circumstances his out-of-court statements were entitled to suppression on grounds that his arrest was illegal and waiver of his right against self-incrimination was involuntary. While evidence to the contrary was elicited during the course of the suppression hearing, defense counsel's decision to proceed first on both issues brought the following circumstances before the trial court in a simultaneous fashion: (1) defendant's mother testified to a warrantless and forceful entry into her home at 11 p.m. to arrest her 17-year-old son; and (2) Officer Ferguson testified that the young man, a 10th grader, was interrogated from 3 a.m. to 5:45 a.m. and that his mother was not present at such session. It appears to us that neither bifurcating the proceeding to consider separately the illegality of the arrest and the voluntariness of his waiver nor requiring the State to proceed first on the sole issue of voluntariness would have achieved a different result. In the light thereof, we do not believe that the trial court, by allowing defense counsel to proceed first and adduce evidence related to both issues, displayed confusion on the part of the trial court regarding the State's burden of establishing voluntariness.

Defendant next contends that he was not proved guilty of rape beyond a reasonable doubt. Courts of review are especially charged with the duty of carefully examining the evidence in rape cases and to reverse the conviction if such evidence is insufficient to remove all reasonable doubt of defendant's guilt and to create an abiding conviction that he is guilty of the crime charged. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865.) However, in discharging such duty, a reviewing court cannot encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence presented, justify a reversal of a finding of the trier of fact on grounds that the evidence is conflicting, or set aside a finding of guilty, unless the evidence is so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause

reasonable doubt regarding the guilt of the accused. *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.

■■ To establish the commission of rape, the act of sexual intercourse must have been accomplished by use of force and against the will of the complainant. (*People v. Johnson* (1971), 132 Ill. App. 2d 564, 270 N.E.2d 130.) Although no definite standard for fixing the amount of force required for rape exists and each case must be considered on its own facts (*People v. Jackson* (1968), 103 Ill. App. 2d 209, 243 N.E.2d 551, *cert. denied* (1970), 397 U.S. 957, 25 L. Ed. 2d 142, 90 S. Ct. 948), it has been noted that such actual or threatened force as coerces a female to engage in sexual intercourse is sufficient to establish rape (*People v. Smalley* (1976), 43 Ill. App. 3d 600, 357 N.E.2d 93).

■■ Concerning resistance, it is fundamental that a female who has the use of her faculties and physical powers must exhibit such resistance as will demonstrate that the act was against her will. (*Taylor; People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467; *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.) However, if the circumstances show resistance to be futile or life endangering or if the complainant is overcome by superior strength or paralyzed by fear, useless or foolhardy acts of resistance are not required. (*People v. Browder* (1974), 21 Ill. App. 3d 223, 315 N.E.2d 168; *People v. Porter* (1973), 13 Ill. App. 3d 893, 300 N.E.2d 814.) When the record shows little or no resistance on the part of the complainant, the issue is the futility of such resistance under the circumstances. (*People v. Smith* (1965), 32 Ill. 2d 88, 203 N.E.2d 879; *People v. Murphy* (1970), 124 Ill. App. 2d 71, 260 N.E.2d 386.) In *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408, where four ablebodied men seized a young girl, hustled her into their automobile blindfolded and then brutally subjected her to sexual and deviate acts performed by each man, the court said:

> "It would be inconceivable to require actual physical resistance by [the complainant], at the imminent risk of injury or even death, as a condition precedent to concluding beyond reasonable doubt that her assailants were guilty of forcible rape." (49 Ill. App. 3d 387, 393, 364 N.E.2d 408, 413.)

Further, to obtain a conviction for rape, the complainant's testimony must be either clear and convincing or independently corroborated by other evidence. (*People v. Reynolds* (1965), 61 Ill. App. 2d 349, 210 N.E.2d 637.) One form of corroboration is the timely reporting of such incident to the police. (*Secret; People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. DeFrates* (1946), 395 Ill. 439, 70 N.E.2d 591, *cert. denied* (1947), 331 U.S. 811, 91 L. Ed. 1831, 67 S. Ct. 1201.) However, if positive and credible, the complainant's testimony alone is sufficient to sustain a

conviction for rape. *People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375; *People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255. ■■ Here, complainant testified that while riding in an elevator, the car stopped and by working the controls available to her she could not open the door for egress; that a voice emanating from the top of the car threatened to kill her if she did not cooperate; that such voice commanded her to disrobe, tie her blouse around her head, and to cover her eyes; that each of the two times the elevator door was opened, at least one of her assailants was nearby; and that two acts of sexual intercourse occurred in the absence of her consent. She was unable to identify defendant as one of her assailants but, in his statement to police, defendant identified her by her clothing and the contents of her purse and described the assault by time and location, together with a detailed explanation of the procedures he and his companions employed. While his description credited companions, rather than himself, as being involved in the acts of sexual intercourse, he admitted aiding and abetting Robert in doing so by working the elevator controls which allowed him entry into the car. In addition, while his statement quoted complainant as saying, "You don't have to rape me; I'll give it to you," the trial court could have believed this was a statement of coerced cooperation precipitated by fear that her life may have been in danger had she failed to render such cooperation. Moreover, as defendants threatened her life if she did not do as she was told, commanded her to blindfold herself—thus precluding her from ascertaining whether a weapon was in fact trained on her, and because they were in control of her only means of escape, there is ample support for the view that physical resistance on complainant's part would have been useless and foolhardy. (*Carroll; People v. Chambers* (1970), 127 Ill. App. 2d 215, 262 N.E.2d 170.) In addition, the record shows that complainant's testimony was clear and convincing in character, was corroborated by an immediate complaint to her daughter and the police, and was almost identical in detail to the version defendant related to the police. Under the circumstances, we believe that defendant was proved guilty of rape beyond a reasonable doubt.

Lastly, defendant contends that the trial court erred by failing to suppress his out-of-court statements to police. He argues that (a) he was not adequately informed of his right against self-incrimination and consequently did not make a knowing waiver of that right prior to his handwritten statement; (b) since the original handwritten statement was unlawfully obtained, the subsequent written statement was also inadmissible; and (c) his confession and statements were obtained only after his arrest in violation of his fourth amendment rights and hence are tainted by that illegality.

In reviewing a denial of a motion to suppress, one reviewing court has said that:

> "Before an out-of-court statement may be used, even for impeachment purposes, the State must establish by the manifest weight of the evidence its voluntary character. [Citation.] When the State makes a *prima facie* showing that a confession was voluntary, the burden shifts to the defense to produce evidence that the confession was involuntary and reverts back to the State only upon such production. [Citation.] Where a statement is given in consideration of promises of leniency or immunity, it is not voluntarily given and is therefore inadmissible. [Citation.] However, even though threats or promises may have been made, if the evidence as a whole shows that a statement was made voluntarily, it is admissible. [Citation.] The credibility of the witnesses and the weight to be given their testimony are questions for the trial court [citation], and a court of review will not disturb the trial court's determination as to the voluntariness of defendant's statement absent a showing that it is contrary to the manifest weight of the evidence [citation]." (*People v. Slaughter* (1978), 59 Ill. App. 3d 159, 161-62, 376 N.E.2d 33, 35.)

Moreover, once an accused is advised of the *Miranda* warnings and acknowledges his understanding at the threshold of questioning, the voluntariness of a subsequent statement is not compromised by the failure to repeat such warnings at the beginning of each successive interview. *People v. Beamer* (1978), 59 Ill. App. 3d 855, 376 N.E.2d 368.

Concerning defendant's age, it should be noted that a 17-year-old is considered to be an adult for purposes of criminal prosecution. (Ill. Rev. Stat. 1977, ch. 37, par. 702—7.) In any event, "juveniles are not free from police investigation and * * * the failure to have a parent or guardian present during questioning of a juvenile does not necessarily render statements made at that time inadmissible. [Citations.]" *In re Bizzle* (1976), 36 Ill. App. 3d 321, 326, 343 N.E.2d 633, 638.

In the instant case, as admitted by defendant, the warnings enumerated in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, were read to him and he stated that he understood each of them. He urges, however, that the following language from *Miranda* renders the standard warning ineffective where, as here, he was warned that anything he said, but not anything he wrote, could be used against him in a court of law:

> "Our holding * * * briefly stated * * * is this: The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

\* \* \*

[T]o permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

\* \* \*

The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing [*sic*] it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of people acting solely in his interest.

\* \* \*

\* \* \* Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." 384 U.S. 436, 444-76, 16 L. Ed. 2d 694, 706-25, 86 S. Ct. 1602, 1612-29.

■■ Here, although defendant was questioned during the course of the early morning hours and had been in custody since 11 p.m. the previous night, in his statement he said that during this time he was treated well by the police and allowed access to food, drink and toilet facilities. Despite the fact that he was somewhat older than a 10th grader is expected to be, the record does not reveal any evidence of lower than normal intelligence or other mental deficiency or retardation. While we are in agreement with the above-quoted principles, we believe it incredible that after being informed on several occasions that anything he said could and would be used against him, defendant would have believed that anything he wrote on the pad furnished him by police could not also be used against him. Under the circumstances, we do not believe that the trial court erred by denying a suppression of defendant's handwritten notations.

■■ Defendant correctly states that where an earlier out-of-court statement is found to be unlawfully obtained, a subsequent statement

although apparently voluntarily made is inadmissible if made under the same constraint. (*E.g., Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Raddatz* (1968), 91 Ill. App. 2d 425, 235 N.E.2d 353.) However as we have found that the handwritten notations were voluntarily made and therefore admissible, there is no basis to support the contention that the subsequent written statement was tainted by the first.

Concerning the illegality of his arrest, defendant does not assert that the arresting officers lacked probable cause; rather, he argues that section 107—2(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c)), which provides that a peace officer may make a warrantless arrest if he has "reasonable grounds to believe that the person is committing or has committed an offense" is unconstitutional. His position is that even where probable cause to arrest exists, absent a warrant or exigent circumstances, an officer may not enter a citizen's home for the purpose of placing such individual under arrest.

In *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, although reversing on other grounds, the United States Supreme Court noted:

> "It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.' " (403 U.S. 443, 477-78, 29 L. Ed. 2d 564, 589-90, 91 S. Ct. 2022, 2044.)

Further, although again not determinative of the cause before it, the Illinois Supreme Court recognized the existence of such question in *People v. Wolgemuth* (1977), 69 Ill. 2d 154, 370 N.E.2d 1067, *cert. denied* (1978), 436 U.S. 908, 56 L. Ed. 2d 408, 98 S. Ct. 2243. There, it was stated:

> "(Although the United States Supreme Court has consistently reserved judgment on the constitutionality of a warrantless entry into a home to make an arrest absent exigent circumstances [citations], at least five Federal courts of appeal have acknowledged that such warrantless entries may be unconstitutional. [Citations.])" 69 Ill. 2d 154, 159-60, 370 N.E.2d 1067, 1069-70.

In the instant case, however, defendant's argument and citation of authority, in our opinion, overlook consent to the officer's entry as an established exception to the warrant requirement of the fourth and fourteenth amendments. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *Davis v. United States* (1946), 328 U.S.

582, 90 L. Ed. 1453, 66 S. Ct. 1256; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 321 N.E.2d 38.

Here, Officer Reid testified that he knocked on the door of defendant's apartment; that he and his partner were invited into the living room by defendant's mother; and that after announcing their office, they stated that they had information from other participants that defendant was involved in the commission of rape, and they indicated that they were there to take defendant in for questioning. While defendant's mother testified that the entry was forceful, the trial court chose to believe the testimony of Officer Reid. Moreover, defendant did not contend either in the trial court or before this court that his mother was not a proper person to consent to the officers' entry. The entry being consensual, we cannot say that the warrantless arrest here was violative of the fourth amendment or that section 107—2(c), as applicable to the facts here, is unconstitutional. Therefore, we conclude it was not error to deny the motion to suppress statements made after defendant's arrest.

For the foregoing reasons, the judgment appealed from is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.